[Civ. No. 13454. Third Dist. Sept. 21, 1973.]

ALBERT MYRON OTTER, Plaintiff, Cross-defendant and Respondent, v.
GENERAL INSURANCE COMPANY OF AMERICA et al.,
Defendants, Cross-complainants and Respondents;
INSURANCE COMPANY OF NORTH AMERICA et al.,
Defendants, Cross-complainants and Appellants;
LAMPARD-OTTER, INC., et al., Cross-defendants and Respondents.

**COUNSEL**

Barfield, Barfield, Dryden & Ruane, Cyril Viadro and George O. Brekke for Defendants, Cross-complainants and Appellants.

James J. Duryea, Rust & Mills, Henry G. Matheny and David B. Johnson for Defendants, Cross-complainants and Respondents.

No appearance for Plaintiff, Cross-defendant and Respondent and for Cross-defendants and Respondents.

**OPINION**

**PIERCE, J.\***—This is a declaratory relief action brought by Albert Otter. Superficially[1] it is just another action involving counter-contentions between several indemnity insurance companies as to which, under the terms of the respective policies involved, pays how much, if any, of sums due under the several policies involved.

---

\*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

[1]Actually, it appears to this court to be a step in the evolution of the law of California applicable to contracts of adhesion as applied to indemnity insurance policies.

The trial court held that Insurance Company of North America (INA), the insurer under an umbrella *excess* policy is, under the terms thereof, liable to pay all of such balance. We agree that American Home, an underlying insurer of a specified named insured, was properly held not liable. We believe that General Insurance Company (General) was improperly absolved by the trial court.

A second question confronts us. A motion has been made before this court by the attorney who represented *both General and INA* in the trial court to strike portions of the appellate brief of INA (written by substituted attorneys). The portions sought to be stricken are those which criticize dual representation. We hold that there was an irreconcilable conflict of interest between those two insurers and therefore deny the motion.

## The Facts

"Jefferson Motors, Inc., A Corporation and Jefferson Motors, DBA Jefferson Leasing" is principally owned by Carl Jefferson of Concord. Albert Myron Otter, a close friend of Jefferson, is a travel agent. He is part-owner and president of Lampard-Otter, Inc., a travel agency. On the morning of June 15, 1968, the two men, Jefferson and Otter, had occasion to be at the San Francisco airport. They had driven there in a 1968 Lincoln belonging to, and apparently used as a demonstrator in the business of, Jefferson's incorporated automobile dealership. Otter owned a Mercury Cougar which he had bought from Jefferson Motors. At a stop en route home Otter mentioned to Jefferson a prospective social weekend trip to Lake Tahoe to visit William Breuner, president of John Breuner Company, at the latter's mountain home. The Otters expected to drive through Sacramento Valley on a hot day. The Jefferson Motors' Lincoln was air-conditioned, the Otter Mercury was not.

In addition to the fact that Jefferson and Otter were close friends, the former conceived the idea that William Breuner, manager and a principal owner of a chain of furniture stores, was a prospective purchaser of a Lincoln Continental from Jefferson Motors. (The Breuners lived in the Concord trade area.) Jefferson suggested to Otter that the latter use the Lincoln on his Tahoe trip. In the sense that it may be doubted that Jefferson would have made the same offer to one with whom he was less well acquainted, and that the air conditioning of the Lincoln was a contributing reason for the offer, the record (Jefferson's depositions) nevertheless contains substantial evidence that the offer of the trip to Tahoe was also a means of proposed demonstration of the Lincoln to Breuner—and the trial court so stated in a memorandum opinion, as follows: "The court is

satisfied that as to Jefferson Motors the use of the Lincoln was prompted by the business interests of the corporation, permitting Otter to enjoy the automobile, as a demonstrator in the hope that he and others (with whom he was expecting to associate over the weekend) would be interested in purchasing a Lincoln."[2]

The trip commenced and the accident happened on the same date, June 15, 1968. Otter was driving easterly through Placer County on United States Highway 80. Otter negligently collided with a Rambler in which the Wetzsteins were riding and the Wetzsteins were not contributorily negligent. We discuss briefly the disposition of the previously paid portion of the judgment in favor of the Wetzsteins in a Placer County action brought by them against Otter, Jefferson and the business firms they control. Pacific Indemnity insured Otter individually in an "underlying" indemnity policy with limits of $100,000-$300,000. Pacific Indemnity undertook Otter's defense. Pending trial of the Wetzstein action, a settlement of $72,500 was made by that insurer of Mr. Wetzstein's claim and a dismissal with prejudice of his claim for damages was made. During trial of Mrs. Wetzstein's case, a stipulated judgment of $300,000 was entered against Otter. Of that amount, Pacific Indemnity paid $100,000 (thus discharging the limits of its policy liability). It has not appealed. The sum of $200,000 of Mrs. Wetzstein's judgment remains unpaid and payment will be determined by this appeal.[3] That brings us to the issues relevant to this litigation.

*The INA Policy*

INA issued a policy to Jefferson Motors, Inc., termed "Excess Blanket Catastrophe Liability Policy *No. XBC 2 42 05*." The policy period was from April 30, 1966, to April 30, 1969. The limit of its liability is clearly spelled out. In readable language and in bold faced type it informs its insured: "It is agreed by the insured that the following *underlying* insurance [by another insurer] is in force as collectible insurance at inception of this policy for the limits of liability stated hereafter.

" . . . . . . . . . . . . . . . ."

| "(c) Automobile Liability | Bodily Injury Liability $100,000.00 Each Person $300,000.00 Each Accident |
| --- | --- |

[2]There was ample evidence from which the trial court might have drawn the inference that the "others" might have been Lincoln purchasers potentially—to wit: the Breuners. There is nothing in the record to support a probability that either Jefferson or Otter himself considered Otter to be a prospective purchaser.

[3]James J. Duryea, the attorney playing the dual role in this action of representing both General and INA in the trial court has filed a petition for a rehearing. The in-

Property Damage Liability
$50,000.00 Each Accident

" . . . . . . . . . . . . . . . . . ."

(Our italics.)

In referring to such underlying policy, the parties were not referring to the policy of Pacific Indemnity (Pacific insured *Otter* individually). It will be the burden of this opinion to demonstrate they had in mind the policy of General. Jefferson Motors bought the INA policy (through its insurance agent Krueger & Co.—the same agent through whom it bought the General policy). Jefferson Motors obviously wanted its business protected by the underlying insurance and in addition a policy of excess insurance affording much greater coverage.

The INA policy so states. It tells its insured that it is insurance *in excess of all other insurance.* It says under the caption "Other Insurance: If other collectible insurance with any other insurer is available to the insured covering a loss also covered hereunder (except insurance purchased to apply in excess of the sum of the retained limit and the limit of liability hereunder), the insurance hereunder shall be in excess of, and not contribute with, such other insurance. . . ." The policy limit of the INA insurance is $1,000,000. The trial court expressly found the INA policy to be excess insurance. In the language of the insurance industry a policy of the type issued by INA is called an "umbrella" policy.

*The General Insurance Policy*

At the same time or before the INA policy was bought, Jefferson Motors purchased through Krueger & Company an underlying $100,000-$300,000 policy, General Policy No. CP 169542. We turn to it now. It is an exceedingly difficult policy to read.

---

terests of General and INA were actually antipodal. In the rehearing petition, Duryea (now openly representing General and opposing INA) compounds the earlier impropriety of his dual representation which we will discuss below. To his petition for rehearing he attaches an appendix adding a stipulation made December 8, 1971 (the judgment of the trial court having been made June 24, 1971), and obviously not a part of the record before this court. The stipulation was solicited in a letter received approximately the date Mr. Duryea was composing his petition for rehearing. The stipulation was expressly made that INA by its payment to Mrs. Wetzstein would not waive any right of appeal. This stipulation was outside the record, thus reference to it was a grossly improper attempt to influence the decision of this court. In the rehearing petition referred to above it is claimed: "It is obvious that at one time INA agreed with General's position." To this court it is more obvious that Mr. Duryea, not INA, agreed with General's opinion.

It starts with a seal containing a declaration that it is a "SPECIAL MULTI-PERIL POLICY COMMERCIAL," prepared for Jefferson Motors through "your Independent Insurance Agent," Krueger & Company, whose name and address is typewritten at the bottom of the page. Next occurs an "INDEX OF COVERAGES," in which under "Liability" both blanket and garage liability are listed. There are other provisions in the body of this "index" page which are meaningless in the context of this case or seem so to the uncognizant. "Other Insurance," a caption under which "Automobile Dealers Floater Section V, Schedule A" is written and might seem relevant excepting that we have searched for an "other insurance" clause in Section V, Schedule A, and there is none. Thus, obviously the index furnishes no clue or guide to an insured. A clause contained on the twelfth unnumbered page of the policy is argued as a basis for noncoverage. We will discuss this below.

The second page of General Policy CP 169542 covers the apparent liability of the company for bodily injury and property damage. The limits are $100,000-$300,000 bodily injury and $50,000 property damage. This is stated to cover blanket liability and garage liability. It appears to be underlying.

The endorsement termed "garage liability" describes the coverage provided by this policy. The endorsement states that " 'garage' means an automobile sales agency . . . ." It covers "Automobile Hazard 1," the meaning of which includes inter alia "the occasional use [outside the sales agency itself] . . . of any automobile owned by . . . the named insured . . . while furnished for the use of any person."

At the outset of the garage liability endorsement, it is stated: "This endorsement modifies such insurance as is afforded by the provisions of the policy relating to . . . Blanket Liability Insurance." Under the "persons insured" provisions of the garage endorsement, the following is stated: "II. 'Persons insured' provision for blanket liability insurance is deleted and replaced as follows: . . . None of the following is an insured: . . . (v) any person *other than the named insured or his agent or employee* if there is any other valid and collectible insurance applicable to the same loss covering such person as an insured named therein or as an agent or employee of an insured named therein under a policy with limits at least equal to the financial responsibility requirements specified in section 16059 of the Vehicle Code of California. This provision shall not apply if such person is accompanied by the named insured, his agent or employee." (Our italics.)

The quoted clause is the basis of the front-line argument of General as to why its policy is inapplicable. This clause is a paraphrase of the limitation of coverage permitted by the Legislature in enacting Insurance Code section 11580.1, subdivision (f). This section must be construed in conjunction with subdivision (d) of the same section which requires that every policy of automobile insurance extend coverage to the permissive user in the same extent as to the named insured.[4]

■ As recently stated by Justice Tobriner in *Metz* v. *Universal Underwriters Ins. Co.* (1973) 10 Cal.3d 45 at page 53 [109 Cal.Rptr. 698, 513 P.2d 922]: "We have uniformly held that 'the *entire* automobile financial responsibility law must be liberally construed to foster its main objective of giving "monetary protection to that ever changing and tragically large group of persons who while lawfully using the highways . . . suffer grave injury through the negligent use of those highways by others." ' " Therefore, we will apply this rule of construction and construe provision II(v) of General's policy in accordance with the expressed legislative goal of extending coverage.

In *Metz, supra,* Underwriters attempted to negate Insurance Code section 11580.1, subdivision (d), by relying on subdivision (f). Our Supreme Court distinguished that subdivision as being inapplicable to the facts there involved. The facts here are different, but under them subdivision (f), as we shall point out below, is equally inapplicable. Under our discussion of THE LAW applicable to this policy, we will cover this and other policy provisions.

*American Home Policy*

■ This policy provided liability coverage to the Lampard-Otter Travel Agency. It would have covered Otter when he was engaged in travel agency operations, not otherwise. Substantial evidence supported the fact that Otter's proposed visit to the Breuners at their Tahoe home was a social, not a business trip, and the trial court so found. Undoubtedly Otter hoped the Breuner family would book its future traveling through him and his

---

[4]As of 1965, Insurance Code section 11580.1, subdivision (d), provided that every policy of automobile insurance include a provision "insuring the insured named therein and to the same extent that coverage is afforded such named insured in respect to said described motor vehicles, any other person using, or legally responsible for the use of, said motor vehicles, provided the motor vehicles are being used by the named insured *or with his permission,* express or implied." (Our italics.) In 1970 subdivision (d) of section 11580.1 was repealed, but similar language requiring coverage of permissive users was added to section 11580.1 as subdivision (b)(4).

travel agency, but that was not the purpose of the trip in any sense that could bring the American Home policy into operation. Every business or professional man hopes his friends will favor him with their business. It would be unrealistic to deem business pursuits as being a motivating cause for a visit under facts such as those existing here. There is no merit to the argument—and the circumstances are not at all comparable to the loan of Jefferson Motors' Lincoln Continental for demonstration purposes, as we shall explain.

Further treatment of the liability of American Home under its policy is unnecessary. We hold it is not liable.

## THE LAW

### Generally

■ Before our discussion turns to the specific liability imposed by the two insurance policies in question, some generalization is possible: Prior to 1966 and the significant impetus given by *Gray* v. *Zurich Insurance Co.* (1966) 65 Cal.2d 263 [54 Cal.Rptr. 104, 419 P.2d 168], certain rules of interpretation had become well settled regarding insurance policies, e.g.: Insurance policies will be afforded liberal construction, and uncertainties will be resolved against the insurer. (*State Farm Mut. Auto. Ins. Co.* v. *Johnston* (1973) 9 Cal.3d 270, 274 [107 Cal.Rptr. 149, 507 P.2d 1357]; *Wint* v. *Fidelity & Casualty Co.* (1973) 9 Cal.3d 257, 261 [107 Cal.Rptr. 175, 507 P.2d 1383]; *Crane* v. *State Farm Fire & Cas. Co.* (1971) 5 Cal.3d 112, 115 [95 Cal.Rptr. 513, 485 P.2d 1129, 48 A.L.R.3d 1089]; *Vanguard Ins. Co.* v. *Hartford Ins. Co.* (1970) 9 Cal.App.3d 765, 767 [88 Cal.Rptr. 628].) ■ Any uncertainty as to persons insured will be resolved against the insurer and in favor of imposing liability. (*State Farm Mut. Auto. Ins. Co.* v. *Johnston, supra; Continental Cas. Co.* v. *Zurich Ins. Co.* (1961) 57 Cal.2d 27, 32 [17 Cal.Rptr. 12, 366 P.2d 455]; see *Universal Underwriters Ins. Co.* v. *Gewirtz* (1971) 5 Cal.3d 246, 250 [95 Cal.Rptr. 617, 486 P.2d 145].) ■ An insurance policy will be construed in order to achieve the object of securing indemnity to the insured for losses to which the insurance relates. (*Crane* v. *State Farm Fire & Cas. Co., supra,* at p. 115.) ■ The policy will be viewed in light of its general objects and purposes. (*Insurance Co. of North America* v. *Electronic Purification Co.* (1967) 67 Cal.2d 679, 689 [63 Cal.Rptr. 382, 433 P.2d 174].) ■ As stated in *Crane* v. *State Farm Fire & Cas. Co., supra,* 5 Cal.3d at page 115: "The policy should be read as a layman would read it and not as it might be analyzed by an attorney or an insurance expert." The citations above are by no means exhaustive.

*Gray* v. *Zurich, supra,* 65 Cal.2d 263, was not the first California Supreme Court case to express the theory of "reasonable expectations" (of the insured) as the governing factor. In Melnick's California Automobile Insurance Law Guide (Cont.Ed.Bar 1973) chapter 1, Overview of Automobile Insurance, section 1.15, pages 13 and 14, it is said: "For example, in *Raulet* v. *Northwestern Nat'l Ins. Co.* (1910) 157 C 213, 230, 107 P. 292, 298, the court refused to hold the insured to the terms of the policy, recognizing that few policyholders are actually aware of these policy provisions:

" 'It is a matter almost of common knowledge that a very small percentage of policy-holders are actually cognizant of the provisions of their policies. . . . The policies are prepared by the experts of the companies, they are highly technical in their phraseology, they are complicated and voluminous . . . and in their numerous conditions and stipulations furnishing what sometimes may be veritable traps for the unwary. The insured usually confides implicitly in the agent securing the insurance, and it is only just and equitable that the company should be required to call specifically to the attention of the policy-holder such provisions as [company not liable on policy until premium paid].'

" 'The courts, while zealous to uphold legal contracts, should not sacrifice the spirit to the letter nor should they be slow to aid the confiding and innocent.'

"It was in *Gray* v. *Zurich Ins. Co., supra,* that the reasonable expectations approach received its most explicit authorization. *Gray* posed the question whether the insurer was obligated to defend its insured for an assault complaint arising from a postaccident confrontation. The Supreme Court, speaking through Justice Tobriner, laid down the following principles (65 C2d at 269, 54 CR at 107):

" 'As this court has held, a contract entered into between two parties of unequal bargaining strength, expressed in the language of a standardized contract, written by the more powerful bargainer to meet its own needs, and offered to the weaker party on a "take it or leave it" basis carries some consequences that extend beyond orthodox implications. Obligations arising from such a contract [inure] not alone from the consensual transaction but from the relationship of the parties.

" 'Although courts have long followed the basic precept that they would look to the words of the contract to find the meaning which the parties expected from them, they have also applied the doctrine of the adhesion contract to insurance policies, holding that in view of the disparate bar-

gaining status of the parties we must ascertain that meaning of the contract which the insured would reasonably expect.' "

Although *Gray* v. *Zurich, supra,* is a "leading case," our Supreme Court has indicated that the "reasonable expectations" doctrine cannot be used as a catch-all. In *Hogan* v. *Midland National Ins. Co.* (1970) 3 Cal.3d 553 [91 Cal.Rptr. 153, 476 P.2d 825], for example, where a products liability policy was expressly *and* cognizably limited to "accidents" our Supreme Court refused to give the word "accident" a strained or unusual meaning. ■ But, as stated by the author of the "Guide" cited above, the reasonable expectations doctrine is still the law. It is stated (on pp. 14 and 15): "In a proper case the insured may be covered despite unambiguous language in the policy to the contrary. See, *e.g., McGinnis* v. *Fidelity & Cas. Co.* (1969) 276 CA2d 15, 80 CR 482. As a corollary to this principle, courts have recently started to require the insurer not only to draft the policy in unambiguous terms, but also to bring exclusions and limitations to the attention of the insured. See, *e.g., Paramount Properties Co.* v. *Transamerica Title Ins. Co.* (1970) 1 C3d 562, 83 CR 394; *Fletcher* v. *Pacific Indem. Group* (1972) 102 CR 868, 872 (dictum: 12-month limitation period in personal property insurance upheld because normal expectation of insured would be that he would have a reasonable time to sue once company [rejected] claim); *Young* v. *Metropolitan Life Ins. Co.* (1969) 272 CA2d 453, 77 CR 382; *Rogers* v. *United States Fid. & Guar. Co.* (1968) 260 CA2d 404, 67 CR 251."

*Applicability of General's Policy No. CP 169542*

As we have stated, it is General's principal argument that Otter was not covered by the garage liability endorsement because he expressly comes within paragraph "(v)" of "None of the following is an insured." We have quoted that clause hereinabove on page 947, *supra.* By its express provisions, however, that exclusionary clause applies *only* to a "person other than the named insured or his agent . . . ." Therefore if, at the time of the accident Otter was *in any substantial respect* serving in the capacity of an agent for Jefferson Motors, the exclusionary provision has by the express wording thereof no application. In such an event, contrary to General's claim, at least insofar as that clause is concerned, Otter would be an insured.

General asserts that Otter was not an agent. With equal assurance INA pronounces that he was. We need go no further than Civil Code section 2295, which defines an agent, to assert that Otter *was* the agent of Jefferson Motors. It states: "An agent is one who represents another. called the

principal, in dealings with third persons. Such representation is called agency." "Agent" is synonymous with "representative." (*Sunset Milling & Grain Co.* v. *Anderson* (1952) 39 Cal.2d 773, 778 [249 P.2d 24].) **(9)** Once one reaches the conclusion, as the trial court properly did, that Otter's trip was partially to demonstrate the Lincoln automobile he was driving to a potential purchaser of a Lincoln, then Jefferson's friend, Otter, driving with his permission, became his agent, his representative, quite as certainly as though one of the regular salesmen of Jefferson Motors had been the driver. Jefferson satisfied the trial judge by his statements in the record that dealers of luxury automobiles do not bludgeon prospective purchasers into buying their product. It is reasonable to believe that the apparently casual showing of the car by a weekend guest was an application of the "soft-sell" calculated to take Mr. Breuner into the salesrooms of Jefferson Motors better than any other method Mr. Jefferson could have employed. We will not pronounce that determination in the trial court's findings to be error. Also, it appears to us to be axiomatic that since this was a demonstration, since a demonstration must be made by someone, and since it was made neither by Jefferson nor a regularly employed salesman, the "someone" who showed the car, Otter, was his agent. Substitute the word "representative" if you please; "representative" and "agent" as used in subdivision (f) of Insurance Code section 11580.1 in 1965 and as paraphrased in General's policy II(v) quoted above, are synonymous.

Moreover, the well-settled rules long existent liberally construing insurance contracts in favor of the insured and against the insurer (cited above) would require interpretation in favor of declaring Otter to be an insured under the garage liability endorsement of the policy. To those rules we may now add the "reasonable expectations" doctrine of *Gray* v. *Zurich, supra,* and its offspring.

The same rule prevents us from reaching beyond the garage liability endorsement and the unindexed "Other Insurance" clause in the asserted "Section 11 - Conditions" allegedly cancelling out the very underlying purpose of the policy—purchased through Krueger & Company to complement the INA umbrella policy.

As we have indicated above, another clause upon which General relies is: "If, applicable to the loss, there is any valid and collectible insurance, whether on a primary, excess or contingent basis, available to the insured (in this or in any other carrier), there shall be no insurance afforded hereunder as respects such loss; except, that if the applicable limit of liability of this policy is in excess of the applicable limit of liability provided by the other insurance, this policy shall afford excess insurance over and above

such other insurance in an amount sufficient to afford the insured a combined limit of liability equal to the applicable limit of liability afforded by this policy. Insurance under this policy shall not be construed to be concurrent or contributing with any other insurance which is available to the insured."

If this clause means what it seems to say, then the insurers have gotten their positions reversed somehow; i.e., it postulates that INA has written the policy with "underlying" coverage of $1,000,000 and General is in the fortunate position of providing an "umbrella" policy of only $100,000-$300,000 excess insurance. That is certainly not what the parties intended. As stated, General's policy furnished underlying coverage. Its "garage liability" coverage *is* "underlying" as a layman would understand it. Webster's Third International Dictionary, Unabridged, states as a meaning of the term "underlying": "Anterior and prior in claim." That is also the meaning which the parlance of insurance men ascribes to the word. As stated above, "umbrella" coverage is excess insurance over and above all underlying coverage.

 As we have already explained, it is quite apparent that when Jefferson Motors bought the General policy, it bought and paid its premium for underlying coverage of garage liability of $100,000-$300,000, and when it bought its INA policy, it bought and paid for an "umbrella" policy of $1,000,000 of insurance which was intended to be, was stated to be, and must be interpreted to be, excess over all other available insurance.

We hold that General is liable to the extent of its policy limits which, under the facts of this case, is $100,000. INA is liable for the excess: $100,000, both such sums to bear interest as to Mrs. Wetzstein as provided in the judgment of the trial court.

Therefore, the judgment of the lower court must be reversed to the extent that it excludes General from liability to pay such policy limits and transfers that liability to INA.

If it appears when the remittitur goes down to the trial court that INA has heretofore paid the sum of $100,000 to Wetzstein which General was obligated to pay, the trial court shall by its order direct recoupment in favor of INA and against General.

The trial court made a finding that $4,863 in costs, fees and expenses was reasonably incurred in defending Otter and in investigating the circumstances surrounding said claims. General and Pacific were found to have shared this expense in the several amounts stated. In the judgment amounts

were awarded based upon the assumption that General was not liable under its policy. Since this court holds that it is, a redistribution must be made and debits and credits must be made between Pacific Indemnity, General and INA in the proportion of liability of each of the companies under their policy limits as debits, and amounts heretofore paid, as credits. Judgment is reversed in the following respects: (1) General is held liable under its policy with INA's liability correspondingly reduced both as hereinabove provided; also (2) the sum of $4,863 shall be redistributed by the court as hereinabove provided (unless said three insurers can reach agreement as to such apportionment). In all other respects judgment is affirmed. In the interest of justice General shall bear costs on appeal.

*The Motion to Strike of General*

As stated at the outset of this opinion, General, taking exception to criticism expressed in the opening brief of INA to the fact that the same attorney represented both General and INA in the trial court where (as this opinion has demonstrated) their interests, if not antipodal, were certainly in irreconcilable conflict, has moved to strike portions of said brief critical of such dual representation.

In support of said motion, it is pointed out that before such dual representation was undertaken, the question of propriety was referred to an independent attorney or firm of attorneys who advised General that there was no conflict. While true, the record also shows that General's contentions of nonliability at the trial were based solely upon untenable contentions. Further, the contentions made on appeal, particularly those discussed in this opinion, were not made in the trial court. And we must assume they were not stated to the independent attorney.

Moreover, criticism of dual representation does not necessarily equate with either malpractice or chicanery and we do not interpret the wording of INA's opening brief as so implying. It was the duty of the firm of attorneys representing INA on appeal to extend to its client advocacy as vigorous as the law and ethics of the profession permit. That it did. We do not feel that the assertion of the brief which adds up to an argument that, because of the circumstances explained, INA did not receive a fair trial, transcended proper appellate advocacy.

We find no basis whatever for the contention that in some way there was misconduct by the experienced and able trial judge.

The motion is denied.

Richardson, P. J., and Friedman, J., concurred.

A petition for a rehearing was denied October 19, 1973, and the petition of defendants and respondents for a hearing by the Supreme Court was denied November 15, 1973.