**MONROE GUARANTY INSURANCE COMPANY, Appellant–Plaintiff,**

v.

**Angela M. LANGRECK, The Board of Trustees of Indiana University, Michelle Kistner, Adam Schaum, Michael Schaum, Barbara Schaum, Anne Hiduke, Andrew Hiduke, Frances Fischer, Valerie Hiduke, Terry Hiduke, Rosemary Hiduke, and State Farm Mutual Automobile Insurance Company as Subrogee of Erin Punter, Appellees–Defendants.**

No. 53A01–0401–CV–10.

Court of Appeals of Indiana.

Oct. 25, 2004.

---

Todd J. Kaiser, Matthew S. Effland, Ogletree Deakins Law Firm, Indianapolis, IN, Attorneys for Appellant.

David J. Mallon, Jr., L. Alan Whaley, Katherine A. Winchester, Ice Miller Indianapolis, IN, Attorneys for Appellee, the Board of Trustees of Indiana University.

## OPINION

BARNES, Judge.

### Case Summary

Monroe Guaranty Insurance Company ("Monroe") appeals the trial court's entry of summary judgment against it and in

favor of Indiana University ("IU")[1], the Indiana University Rowing Club ("IURC"), and several individual defendants in Monroe's declaratory judgment action regarding insurance coverage for an automobile accident involving several IU students. We affirm.

### Issues

Monroe essentially presents two issues on appeal, which we restate as:

I.   whether the trial court erred in refusing to retroactively reform Monroe's policy so as to exclude the accident from coverage under the policy; and

II.  whether the trial court erred in concluding that Monroe's policy was primary with respect to the accident and that a policy issued by TIG Insurance Company was not primary, but excess to Monroe's policy.

### Facts

On April 30, 1999, Angela Langreck, an IU student and member of IURC, was driving a passenger van to a rowing meet in Wisconsin when she lost control of the vehicle. It flipped, and several passengers sustained severe injuries and some were also ejected from the van. The van was borrowed from a pool of vehicles owned by IU; IURC paid IU to rent the van. Several injured persons filed lawsuits against IU, IURC, Langreck, and Mark Wilson, the IURC coach.

At the time of the accident, a Monroe commercial general liability ("CGL") policy was in effect that listed "Recognized Student Groups" at IU, one of which is IURC, as the named insureds; IU was an additional insured under the policy. Appellant's App. p. 210. The Monroe policy included a "Non-owned and Hired Auto Liability" endorsement, which deleted the standard CGL policy's automobile liability exclusion and which provided:

> [W]e will pay all sums an insured legally must pay as damages because of "bodily injury" or "property damage" to which this insurance applies, caused by an "accident" which occurs during the policy period and arising out of the maintenance or use of a "hired auto" by you or your employees in the course of your business; and/or the use of any "non-owned auto" in your business by any person other than you.

*Id.* at 234. The endorsement also stated, "[t]his insurance is excess over any of the other insurance, whether primary, excess, contingent or on any other basis, that is covering the auto as an owned auto." *Id.* at 235. "Non-owned auto" was defined to mean "any 'auto' you do not own, lease, hire or borrow which is used in connection with your business." *Id.* "Hired auto" was defined to mean "any 'auto' you lease, hire, or borrow." *Id.* "You" was defined to mean the policy's named insureds, which would have included IURC but not IU because it was an additional, not named, insured. *Id.* at 215. Approximately four months after the accident, Monroe attempted to reform these definitions to provide, " 'non-owned auto' and 'hired auto' does not include any 'auto' that is owned by, hired by or rented to the trustees of Indiana University." *Id.* at 249. Additionally, Monroe wanted this reformation to be made retroactive, effective prior to the date of the accident. IU did not agree to make the reformation retroactive.

Also at the time of the accident, IU was the named insured on a "Municipal Re-

---

**1.** Technically, the Indiana University Board of Trustees is the named party in this case. For the sake of simplicity, we will refer only to Indiana University and IU throughout the opinion.

tained Amount Policy" issued by TIG that had a maximum coverage limit of $25 million. *Id.* at 265. The "retained amount" was $1 million and was defined to mean "the amount retained by the Insured or the amount of underlying insurance for damages and Claims Expense arising out of" any incident covered by the TIG policy. *Id.* at 283. The policy essentially had two parts, one of which referred to the $1 million amount as self-insurance, and a second part that listed a schedule of underlying insurance and included the Monroe policy and its limit of $1 million as "General Liability" insurance. *Id.* at 291. The TIG policy included automobile liability coverage. IU also has a self-insurance program whereby it provides $100,000 in indemnity for students who are involved in accidents while driving an IU vehicle.

After the injured individuals began filing lawsuits, IU, IURC, Langreck, and Wilson tendered the suits to Monroe for defense and indemnity. Monroe then filed a declaratory judgment complaint seeking a ruling that it was not required to defend and indemnify the parties because its policy should be retroactively reformed to exclude coverage or, alternatively, that any coverage under the Monroe policy would be excess to the TIG policy. Langreck, IURC, and Wilson moved for summary judgment against Monroe; Monroe filed a cross-motion for summary judgment.[2] On November 10, 2003, the trial court granted Langreck's, IURC's, and Wilson's motions for summary judgment and denied Monroe's cross-motion.

This appeal ensued. Originally, IURC, Wilson, and IU all participated in this appeal, with IURC and Wilson filing one

appellee's brief and IU filing another. However, we subsequently granted IURC's and Wilson's motion to dismiss Monroe's appeal, but as to them only, based upon settlement of the underlying lawsuits against Langreck, Wilson, IURC, and IU, and payment of $1 million by Monroe on behalf of Langreck, Wilson, and IURC. Because Monroe expressly reserved its right to appeal the trial court's grant of summary judgment with respect to IU and to recoup the $1 million payment from IU and/or TIG when it settled, we did not dismiss the appeal in its entirety, and IU remains a party in it.[3]

### Analysis

Our standard of review for a trial court's grant of a motion for summary judgment is well-settled and the same as that used in the trial court: summary judgment is appropriate only where the designated evidence shows that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *RMJ Enterprises, Inc. v. Scottsdale Ins. Co.*, 808 N.E.2d 159, 162 (Ind.Ct.App. 2004). "The moving party must designate sufficient evidence to eliminate any genuine factual issues, and once the moving party has done so, the burden shifts to the nonmoving party to come forth with contrary evidence." *Id.* We must accept as true those facts alleged by the nonmoving party, construe the evidence in favor of the nonmoving party, and resolve all doubts against the moving party. *Id.*

### I. Reformation

At this point in the litigation, Monroe concedes that absent retroactive reformation of its policy, it provides some level of

---

**2.** IU did not file its own separate motion for summary judgment.

**3.** Because we dismissed IURC and Wilson from this appeal, we have not considered their brief in deciding this case. Additionally,

IURC and Wilson moved for oral argument, which we denied simultaneously upon dismissing them from the appeal. No other party moved for oral argument.

coverage for the accident at issue in this case. Langreck, as a student member of IURC, qualified as a named insured under the policy. At the time of the accident, she was driving a vehicle either "hired" or "non-owned" by her or IURC; IU owned the vehicle and IURC had paid to use it. Although Monroe claims it was not intended that coverage would be available in a situation such as this, it points to nothing in the policy language that reflected this intent. In other words, Monroe does not assert that IURC "owned" the vehicle or that coverage is precluded because IU, an "additional" but not "named" insured, "owned" the vehicle. The accident falls under the coverage terms of the "non-owned" and "hired" auto liability endorsement as written at the time of the accident.

█ We now turn to the first issue before us: whether the trial court erroneously granted summary judgment against Monroe on the issue of retroactively reforming its insurance policy. In Indiana, courts may reform written documents in only two well-defined situations: (1) where there is a mutual mistake—meaning there has been a meeting of the minds, an agreement actually entered into, but the document in its written form does not express what the parties actually intended; or (2) where there has been a mistake by one party, accompanied by fraud or inequitable conduct by the remaining party. *Plumlee v. Monroe Guar. Ins. Co.*, 655 N.E.2d 350, 356 (Ind.Ct.App.1995), *trans. denied.* There is no allegation of fraud or inequitable conduct by IU or IURC in this case; thus, we focus solely on whether there was mutual mistake accompanying the issuance of the Monroe policy. In such a case, there can be no reformation unless it is proven that both parties were mistaken in the use of the terms to be corrected and

that both parties agreed to the contract sought to be substituted for that to be set aside. *Id.* Reformations for mistakes are only available if they are mistakes of fact, not mistakes of law. *Estate of Spry v. Greg & Ken, Inc.*, 749 N.E.2d 1269, 1275 (Ind.Ct.App.2001). Equity should not intervene and courts should not grant reformation if the party seeking reformation failed to read the instrument or, if it was read, failed to give heed to its plain terms. *Id.*

█ Resolution of this issue is fact-based; i.e., whether there is any designated evidence to support Monroe's claim of mutual mistake. Monroe designated no evidence that any person involved with the issuance of the policy, whether from Monroe, IU, or the intermediary insurance agency, had any recollection at all of discussions regarding the "non-owned" and "hired" automobile endorsement, let alone any discussions regarding the endorsement's intended scope. Two representatives from IU's risk management office testified in depositions that there were no discussions regarding the endorsement prior to the policy's issuance. There is no evidence as to how or why the endorsement came to be added to Monroe's standard CGL policy. On the other hand, Monroe does not assert that it never intended to provide *any* "non-owned" or "hired" automobile liability coverage under its policy; Monroe clearly intended to include the endorsement.[4] The result is that there is no evidence Monroe and IU had reached any agreement regarding the endorsement that was erroneously excluded or that the endorsement as originally written contravened the parties' expressed intent. As such, there is no proper basis for retroactively reforming the policy against IU's

4. We might presume, given the lack of evidence that IU specifically requested this endorsement, that Monroe regularly includes the endorsement with its CGL policies.

will. *See Gierhart v. Consolidated Rail Corporation–Conrail,* 656 N.E.2d 285, 287 (Ind.Ct.App.1995) (holding reformation was inappropriate where there was no showing that "words were inserted which were agreed to be left out, or that words were omitted which were agreed to be inserted.").

Monroe cites to two other pieces of evidence in support of its claim that the policy should be retroactively reformed. First, it points to the low additional premium charged for the "non-owned" and "hired" automobile endorsement as clear indication that the endorsement was not intended to cover accidents involving IU students driving IU-owned vehicles. The endorsement listed no additional charge for the "non-owned" portion and $103 per year for the "hired" portion, for $1 million in coverage. Putting aside actuarial questions as to what a "reasonable" insurance company might charge for this coverage and whether such charge might be partially included in the overall premium for the policy, this argument fails to create a material issue of fact with respect to Monroe's seeking reformation of the policy. That Monroe might have intended to exclude coverage for IU students driving IU vehicles and charged a premium accordingly again only reveals a mistake on its part in the drafting of the endorsement, not a mistake on IU's part. *See First Equity Sec. Life Ins. Co. v. Keith,* 164 Ind.App. 412, 419–20, 329 N.E.2d 45, 50 (1975) (holding evidence, including that insurer only charged life insurance premium that would ordinarily apply to one-half the amount of coverage actually permitted by policy as written, did not warrant retroactive reformation of policy to reduce coverage amount because it did not demonstrate mistake on insured's part and insurance company did not present evidence on what parties agreed to before the policy was issued).

Second, Monroe directs us to a page in a manual issued by the IU Club Sports Federation that discusses insurance coverage and states, "The driver's automobile insurance will cover claims associated with an accident." Appellant's App. p. 65. Monroe claims this is evidence of IU's intent that the Monroe policy would not cover accidents involving IU vehicles. However, Monroe fails to consider the sentence immediately preceding this one: "[I]njuries suffered during travel *in personally-owned vehicles* are not covered." *Id.* (emphasis added). Thus, even assuming the language in this manual could be indicative of IU's intent vis-à-vis the Monroe policy at the time of its issuance, it leaves open the possibility that accidents during travel in IU-owned vehicles would be covered by IU-procured insurance.

■■■■ It is true that when the Monroe policy was issued, apparently neither Monroe nor IU had consciously contemplated that it would provide coverage under circumstances such as the ones in this case. However, the mere fact that an incident occurs that was not within the contemplation of either the insurer or the insured when the policy was issued should not be enough by itself to warrant unilateral and retroactive reformation of the policy. *See Beck v. Pennsylvania Nat'l Mut. Cas. Ins. Co.,* 429 F.2d 813, 817–18 (5th Cir.1970). There were no discussions or agreements between the parties regarding the endorsement at the time the policy was issued. The plain language of the policy as originally written does in fact give rise to coverage under these circumstances. To the extent Monroe might not have wanted to do so but failed originally to write the policy to capture that intent concerns a unilateral mistake of law and a failure to give heed to the plain language of the policy. Reformation of a contract is not

available in such a situation. *See Gierhart*, 656 N.E.2d at 287 (holding reformation is improper where mistake only goes to the effect of an agreement). We believe that as a general rule, courts should be reluctant to allow an insurance company to unilaterally and retroactively reform a policy to avoid coverage for an incident that otherwise would be covered under the policy language in effect at the time of the incident, absent clear evidence that the insured had reached an *express* agreement with the insurer that was not accurately represented in the policy. There is no such evidence here. The trial court correctly entered summary judgment against Monroe on this issue because there is no material issue of fact with respect to reformation.[5]

## II. Policy Priority

■ Monroe argues in the alternative that if its policy is not reformed and it is required to provide some level of coverage for this accident, the TIG policy is primary and its own policy is excess to TIG's and its limit of $25 million, as well as that policy's $1 million retained amount. Monroe relies upon the "other insurance" clause in the "non-owned" and "hired" automobile endorsement of its policy: "This insurance is excess over any of the other insurance, whether primary, excess, contingent or on any other basis, that is covering the auto as an owned auto." Appellant's App. p. 235. IU counters that although the TIG policy may have covered the auto involved in the accident as an owned auto, that policy is strictly an umbrella or true excess insurance policy that need only pay out if the Monroe policy is exhausted, regardless of the Monroe policy's "other insurance" clause.[6] This issue presents a pure question of law regarding policy interpretation that is particularly appropriate for resolution on summary judgment. *RMJ Enterprises*, 808 N.E.2d at 163.

This is a question of first impression in Indiana. However, numerous courts in other jurisdictions have addressed the question and have aligned themselves with the position IU takes: a true excess insurance policy is secondary in priority to a primary insurance policy, even with respect to an incident for which the primary policy purports to make itself excess to any other available insurance. "When faced with conflicts that exist between an umbrella policy and an essentially primary policy made excess by a nonownership clause, a majority of jurisdictions have adopted the rule that the umbrella policy need not contribute until after the primary coverage is exhausted." *Liberty Mut. Ins. Co. v. Harbor Ins. Co.*, 603 A.2d 300, 302 (R.I.1992). Indeed, it appears that not only is this the majority rule, but the

5. Our conclusion today corresponds with the result reached by the Colorado Court of Appeals in a case IU has cited, *Woodruff v. O'Dell*, 701 P.2d 112 (Colo.Ct.App.1985). In that case, the court held that where the insurer issued a policy to its insured that failed to include a standard restrictive definition of "non-owned" auto that it had intended to include, this unilateral mistake did not warrant retroactive reformation of the policy to include the restrictive definition where there was no evidence the insured had expressly agreed to the definition when the policy was issued. *Id.* at 114.

6. We note that the only issue before us is priority as between Monroe and TIG. The issue of priority between Monroe and Commercial Union, who issued an automobile policy to Langreck's parents and which included her as a covered driver, is not before us. Nor do we need to consider the priority relationship, if any, that would exist between the $100,000 self-insured amount that IU provides on behalf of student drivers such as Langreck and the coverage provided by Monroe.

practically universal rule in jurisdictions that have addressed the issue. Otherwise stated, the prevailing rule is that umbrella insurance coverage is "true excess over and above any type of primary coverage, excess provisions arising in regular policies in any manner, or escape clauses." *Atkinson v. Atkinson,* 254 Ga. 70, 326 S.E.2d 206, 214 (1985) (quoting Appleman, Insurance Law and Practice, § 4909.85 (1981)). *See also Occidental Fire & Cas. Co. v. Brocious,* 772 F.2d 47, 53 (3rd Cir.1985); *Allstate Ins. Co. v. American Hardware Mut. Ins. Co.,* 865 F.2d 592, 594 (4th Cir. 1989); *Allstate Ins. Co. v. Employers Liab. Assurance Corp.,* 445 F.2d 1278, 1283–84 (5th Cir.1971); *United Services Auto. Ass'n v. Empire Fire & Marine Ins. Co.,* 134 Ariz. 64, 653 P.2d 712, 714 (1982); *Allstate Ins. Co. v. Frank B. Hall & Co.,* 770 P.2d 1342, 1347 (Colo.Ct.App.1989); *Aetna Cas. & Sur. Co. v. Beane,* 385 So.2d 1087, 1089–90 (Fla.Ct.App.1980); *Illinois Emcasco Ins. Co. v. Continental Cas. Co.,* 139 Ill.App.3d 130, 93 Ill.Dec. 666, 487 N.E.2d 110, 112 (1985); *Vigilant Ins. Co. v. Allied Prop. & Cas. Ins. Co.,* 609 N.W.2d 538, 540 (Iowa 2000); *United States Fire Ins. Co. v. Maryland Cas. Co.,* 52 Md.App. 269, 447 A.2d 896, 902 (1982); *Bosco v. Bauermeister,* 456 Mich. 279, 571 N.W.2d 509, 519 (1997); *Prudential Prop. & Cas. Ins. Co. v. New Hampshire Ins. Co.,* 164 N.J.Super. 184, 395 A.2d 923, 927 (1978); *State Farm Fire & Cas. Co. v. LiMauro,* 65 N.Y.2d 369, 492 N.Y.S.2d 534, 482 N.E.2d 13, 19–20 (1985); *Liberty Mut. Ins. Co. v. United States Fire Ins. Co.,* 590 S.W.2d 783, 785 (Tex.Civ.App. 1979). The general rule is not altered if an excess clause found in an otherwise primary policy is worded to expressly state that it is excess to "any valid collectible insurance," even "excess" insurance. *See Otter v. General Ins. Co.,* 34 Cal.App.3d 940, 109 Cal.Rptr. 831, 838–39 (1973).

Monroe has cited no cases that hold to the contrary. It only cites one case that it contends stands for the proposition that the "other insurance" clause in Monroe's policy is "[i]n reality . . . a 'super excess clause' which takes precedence over even a simple excess clause such as the TIG policy." Reply Br. p. 13 n.5. The case cited is *Grant v. North River Ins. Co.,* 453 F.Supp. 1361 (N.D.Ind.1978). In fact, we find after reading *Grant* that it is entirely consistent with the line of cases we have cited above and does not support Monroe's claimed proposition. In that case, three insurance companies were involved in a priority dispute, two of which contained "other insurance" clauses. The court noted the general Indiana rule that when there are conflicting "excess" or "other insurance" provisions in two insurance policies, the conflicting provisions are ignored and each "excess" insurer is held liable "for a prorated amount of the resultant damage not to exceed his policy limits." *Id.* at 1369 (quoting *Indiana Ins. Co. v. American Underwriters, Inc.,* 261 Ind. 401, 407, 304 N.E.2d 783, 787 (1973)). However, the court held this rule was inapplicable in the case before it because one of the insurers was clearly an umbrella insurer who never intended to provide primary coverage. *Id.* at 1370. The court held the umbrella insurer was strictly excess to the other insurer, despite the "other insurance" clause in that insurer's policy, which in most situations provided primary coverage. *Id.* Thus, the *Grant* opinion is yet another example of the general rule that as between a true excess insurance policy and a policy that is primary in most instances and purports to be excess in limited circumstances, the primary policy is always primary and the true excess or umbrella policy is always excess even if an occurrence falls within the primary insurer's "excess" coverage provisions. Given the overwhelming weight of

authority adopting this rule and Monroe's failure to cite any authority to the contrary, we adopt this as the rule in Indiana as well.[7] As the *Grant* court necessarily concluded, the pro rata rule announced in *American Underwriters* applies only with respect to two primary insurance policies with competing "other insurance" clauses.

In the present case, there is little doubt that TIG's policy is a true excess or umbrella liability policy, while Monroe's policy is a primary policy that attempts to make itself excess with respect to the "non-owned" or "hired" automobile endorsement. A number of courts and commentators have described the differences between primary policies and umbrella policies. "First, an umbrella policy, in contrast to a primary policy that contains another insurance clause, has been recognized as providing unique and special coverage." *Illinois Emcasco Ins. Co.*, 93 Ill. Dec. 666, 487 N.E.2d at 112. "Umbrella or catastrophe coverage has been defined as 'a needed form of coverage which picks up, above the limits of all other contracts, such as automobile and homeowners coverages, to give the security and peace of mind so necessary today where jury verdicts, or court awards, may be very substantial, to discharge the unexpected, but potentially bankrupting, judgment.'" *Id.* (quoting 8A Appleman, *Insurance Law and Practice,* § 4906, at 348, (1981)). The premiums charged for umbrella coverage

as opposed to primary coverage generally also reflects the different function served by umbrella policies. *Id.* The language of a particular policy and its description of coverage are also relevant in distinguishing between primary and umbrella policies. *See id.*

Here, we begin by noting that on the very first page of the TIG policy, the "Certificate of Liability Insurance," it is marked as an "Excess Liability" policy, not a "General Liability," "Automobile Liability," or any other type of policy. Appellant's App. p. 262. The policy states that it "applies excess of a retained amount." *Id.* at 266. "Retained Amount" is defined in the policy as "the amount retained by the Insured or the amount of underlying insurance for damages...." *Id.* at 283. We further note that under TIG's policy, it expressly disclaims any responsibility or duty to defend or settle any claims made against an insured and simply reserves the right to participate in a defense if it is anticipated that a claim may be so great as to exceed the $1 million amount needed to trigger coverage under the TIG policy.[8]

Additionally, as we observed in the "Facts" section, the TIG policy essentially has two parts, one of which refers to the $1 million retained amount as a "self-insured retention," and a second that has a "schedule of underlying insurance." *Id.* at 262, 291. We agree with IU that this essentially means that if an occurrence is

---

7. This case is somewhat unique in that most of the cases from other jurisdictions addressed coverage conflicts between an overall primary automobile policy and an umbrella policy, whereas this case concerns a primary CGL policy with a "non-owned" or "hired" automobile endorsement versus an umbrella policy. We see no reason not to apply the general rule concerning primary versus umbrella insurers in this case.

8. One factor that arguably might weigh against finding the TIG policy to be an um-

brella or true excess policy is the premium charged: $184,818 per year for $25 million in coverage. The Monroe policy, with $1 million in coverage, cost $14,948 per year. In this case, however, the discrepancy is largely meaningless, because the Monroe policy was issued only to IU student groups, a very narrow subset of potential liability exposure with respect to IU as a whole, while the TIG policy was issued to the entire IU system and would have applied to a much broader range of potential liability.

not covered by one of the policies of underlying insurance, the $1 million retained amount is self-insurance. Here, the Monroe policy and its limit of $1 million is expressly listed as underlying insurance. Monroe makes much of the fact that it is listed as a "General Liability" policy, not an automobile liability policy. However, we find this to be irrelevant; the unreformed Monroe policy clearly provided coverage for this particular automobile accident, regardless of the overall character of the policy as a CGL policy or what it was called in the TIG policy.

Monroe also observes that typical CGL policies specifically exclude automobile liability coverage through standard exclusion "g." Monroe's standard policy indeed contained this exclusion, which precludes coverage for damages "arising out of the ownership, maintenance, use or entrustment to others of any aircraft, 'auto' or watercraft owned or operated by or rented or loaned to any insured." Appellant's App. p. 216. Monroe concludes, "CGL coverage always excludes automobile liability coverage." Reply Br. p. 10. Monroe fails to note, however, that the "non-owned" and "hired" automobile endorsement attached to the standard policy issued to IURC expressly nullified exclusion "g." *See* Appellant's App. p. 234 (copy of "Non-owned and Hired Auto Liability" endorsement stating that certain standard exclusions applied to the endorsement but "[a]ll other exclusions," which would include exclusion "g," "are deleted."). Thus, it is too broad a statement to say *all* CGL policies necessarily exclude any automobile liability coverage; standard CGL policies may do so but the standard may be specifically altered to provide such coverage, as was the case here.

We also note that with respect to the $1 million retained amount applicable to the TIG policy, Monroe incorrectly refers to this as a deductible. There are key differences between a deductible, which generally exist in primary policies, and retained amounts, which generally are found in umbrella policies or policies designed to be excess of a self-insured amount. One difference is that while a deductible is subtracted from a policy's limits, thereby reducing an insurer's total obligation to the insured, the full limits of a policy including a retained amount are available to the insured once that amount has been satisfied. *See* Douglas R. Richmond, *Issues and Problems in "Other Insurance," Multiple Insurance and Self-Insurance*, 22 Pepp. L.Rev. 1373, 1449 (1995).[9] Another key difference is that in a policy with a deductible, the insurer retains complete control of claims handling; in a policy with a retained amount, the insurer has no claims handling responsibility, particularly with respect to claims not exceeding the retained amount. *See id.* Here, as noted, the TIG policy has two aspects, one in which it is excess to IU's self-insurance for some events, and another in which it is excess to underlying insurance for insurance-covered events. The retained amount with respect to either is not a deductible, in that it does not reduce TIG's $25 million total coverage obligation to IU; the total amount IU may actually recover pursuant to the TIG policy for claims expenses and damages combined is $25 million, not $24 million. Finally, TIG does not undertake the obligation to adjust or defend any claims against IU. Labeling the $1 million retained amount in the TIG policy a deductible improperly blurs the

---

9. This article specifically refers to self-insured retentions, although the general observations regarding such retentions versus deductibles would also seem to apply to retentions in an umbrella policy for which there is scheduled underlying insurance.

distinction between primary and umbrella policies.[10]

With respect to the Monroe policy, it is clearly a primary policy that purports to be excess only in limited circumstances. Monroe itself admits in its brief, "It is important to note that the Monroe Policy is not excess in every situation, or even in the majority of situations covered by the policy.... [F]or accidents and/or injuries *not* involving hired automobiles, the Monroe Policy is primary." Appellant's Br. p. 23 (emphasis in original). The policy itself states that it "is primary" except for a few narrowly defined situations. Appellant's App. p. 221. As a default rule (except for the few "other insurance" situations), Monroe undertakes "the right and duty to defend any 'suit' " seeking damages covered by the policy. *Id.* at 215.

We have no doubt that the TIG policy was always intended by all parties to be an umbrella or true excess policy only whose coverage, if an occurrence was covered by underlying insurance such as the Monroe policy, is triggered only upon the exhaustion of the underlying insurance's limits. The Monroe policy by contrast is essentially a primary policy that serves as excess in a few situations. Applying the general rule we adopt today, the TIG policy as an umbrella policy is necessarily excess to the Monroe policy, notwithstanding the Monroe policy's "other insurance" clause.

■■■ Monroe contends that regardless of the type of insurance policies involved, Indiana's so-called "Owner's Statute"

should control the outcome of this case. That statute provides:

> (b) In any case arising from a permittee's use of a motor vehicle for which the owner of the vehicle has motor vehicle insurance coverage, the owner's motor vehicle insurance coverage is considered primary if both of the following apply:
>
>> (1) The vehicle, at the time damage occurred, was operated with the permission of the owner of the motor vehicle.
>>
>> (2) The use was within the scope of the permission granted.
>
> (c) The permittee may not recover under any other motor vehicle insurance coverage available to the permittee until the limit of all coverage provided by the owner's policy is first exhausted.

Ind.Code § 27–8–9–7. Because (1) the TIG policy was issued to IU, the owner of the vehicle concerned, (2) the Monroe policy covered IURC and Langreck, not the vehicle's owner, and (3) Langreck was using the IU vehicle as a permittee at the time of the accident, Monroe contends that the Owner's Statute mandates that the TIG policy is primary and the Monroe policy is excess to TIG's.

Notwithstanding TIG's clear status as an umbrella or true excess insurer, Monroe relies heavily on *United Nat'l Ins. Co. v. DePrizio*, 705 N.E.2d 455 (Ind.1999), for the proposition that the TIG policy is "motor vehicle insurance coverage" within the meaning of the Owner's Statute that must take priority over the Monroe policy. In *DePrizio*, our supreme court addressed

---

**10.** Monroe notes that we recently implied that a retained amount in an excess or umbrella policy is equivalent to a deductible in *PSI Energy, Inc. v. Home Ins. Co.*, 801 N.E.2d 705 (Ind.Ct.App.2004), *trans. denied.* We said: "At each site, Commercial Union policy number AW–8500–380 provided $10,000,000 of excess liability coverage in excess of Home Insurance company's $5,000,000 policy lim-

its, under which PSI's self-insured retention amount (i.e. deductible) was $25,000." *Id.* at 713. That comment was strictly dicta that had no bearing on the outcome of the case; the differences between retained amounts and deductibles and between true excess policies and primary policies were not at issue in that case.

whether umbrella insurers who provide excess automobile liability coverage are also required to provide uninsured and underinsured motorist coverage pursuant to the uninsured/underinsured motorist statute, Indiana Code Section 27-7-5-2. The court concluded that an umbrella insurance policy providing general automobile liability coverage is "an automobile liability policy or motor vehicle liability policy" within the meaning of the statute. *Id.* at 464. Thus, umbrella insurers are required to provide uninsured and underinsured motorist coverage. *Id.*

The court reached this result for several reasons. First, it found nothing in the language of the statute to indicate the legislature intended to exclude an umbrella policy from the reach of the uninsured/underinsured motorist statute "merely because it depends on a primary policy or covers additional types of liability." *Id.* at 459. Second, the court addressed the intended scope of the uninsured/underinsured motorist statute. *Id.* at 459–61. It noted that the statute had originated as a "minimum recovery" statute and had evolved into a "full recovery" statute, which supported including umbrella policies within the scope of the revised and broader statute. *Id.* at 461. It also found that several other jurisdictions with "full recovery" uninsured/underinsured motorist statutes similar to Indiana's had concluded that umbrella insurers were required to provide uninsured/underinsured motorist coverage. *Id.* at 461–63. Finally, the court stated, "it is reasonable for … consumers to expect to be able [to] call upon … umbrella policies to supplement their coverage when those perils involve uninsured and underinsured motorists." *Id.* at 463.

As is evident from our supreme court's analysis, it was focused intently upon the particular language, purposes, and history of Indiana's uninsured/underinsured motorist statute, and how other courts in other jurisdictions had approached the issue. Thus, *DePrizio* is, at best, only marginally relevant to the issue before us concerning a completely different statute. At the very least, *DePrizio's* conclusion that an umbrella insurance policy is an "automobile liability policy or motor vehicle liability policy" for purposes of the uninsured/underinsured motorist statute cannot be translated wholesale into a conclusion that an umbrella insurance policy is also necessarily "motor vehicle insurance coverage" for purposes of the Owner's Statute.

The standard for our interpretation of statutes is well-settled:

> When interpreting a statute, appellate courts independently review a statute's meaning and apply it to the facts of the case under review. If a statute is unambiguous, that is, susceptible to but one meaning, we must give the statute its clear and plain meaning. If a statute is susceptible to multiple interpretations, however, we must try to ascertain the legislature's intent and interpret the statute so as to effectuate that intent. We presume the legislature intended logical application of the language used in the statute, so as to avoid unjust or absurd results.

*Bolin v. Wingert,* 764 N.E.2d 201, 204 (Ind.2002) (citations omitted).

Monroe's proffered construction of the Owner's Statute has some support. Indiana Code Section 27–8–9–6(c) defines "motor vehicle insurance coverage" for purposes of the Owner's Statute as "any type of insurance coverage described in IC 27–1–5–1, Class 2(f)." Indiana Code Section 27–1–5–1, Class 2(f) in turn describes insurance coverage "against any loss, expense and/or liability resulting from the ownership, maintenance, use and/or opera-

tion of any automobile or other motor vehicle, including complete line coverage on automobiles or other motor vehicles...." Thus, the statutory definition of "motor vehicle insurance coverage" does not expressly exclude umbrella coverage and, arguably, such coverage is necessarily included in that definition because it refers to "any" insurance for automobile liability.

Nonetheless, we conclude that including umbrella insurance policies within the definition of "motor vehicle insurance coverage" for purposes of the Owner's Statute is not required by the evident legislative intent behind the statute, and indeed would lead to an absurd result contrary to the expectations of those issuing and purchasing umbrella insurance policies. In *American Family Mut. Ins. Co. v. Continental Cas. Co.*, 200 Ariz. 119, 23 P.3d 664 (2001), the Arizona Court of Appeals addressed precisely this question and reached the same conclusion regarding a statute similar in all relevant respects to the Indiana Owner's Statute. In that case, as here, there was a priority dispute between an umbrella insurer covering an auto involved in an accident and a primary insurer who covered the driver, but not the auto. The primary insurer argued that the umbrella insurer was required to exhaust its coverage limits before the primary insurer was required to pay pursuant to an Arizona statute dictating that if two automobile insurance policies apply to an occurrence, the policy that rates or describes the auto is always primary. The court rejected this argument. It noted that the statute had apparently been enacted:

> to address the conflict between policies that cover an insured individual using a non-owned vehicle and policies that insure the vehicle and whoever is driving it, each with language limiting coverage when "other insurance" covers the accident. The legislature obviously wanted to break the tie between policies *provid-ing the same layer of protection* by establishing a presumptive rule as to who pays first. There is no reason to conclude that the legislature even contemplated umbrella policies—true excess policies that provide a different layer of coverage—when it enacted [the statute].

*Id.* at 667 (citations omitted) (emphasis added).

This reasoning persuades us, especially in light of our earlier discussion regarding the differences between umbrella and primary policies and the expectations of insurers and insureds with respect to umbrella policies in particular. It is clear the legislature in enacting the Owner's Statute wished to simplify coverage disputes where competing primary insurers have conflicting "other insurance" clauses that threaten to leave an injured party without access to insurance coverage for an accident. We do not think the statute was intended to force an umbrella insurer to pay ahead of a primary insurer, especially where, as here, the primary insurer is expressly listed as underlying insurance in the umbrella insurer's policy.

Established precedent and scholarly commentary provides that in coverage priority disputes between a primary insurer that purports to be excess in limited circumstances and an insurer who issues a true excess or umbrella liability policy, the umbrella policy is always excess to the essentially primary policy. TIG's policy is clearly a true excess or umbrella policy, while Monroe's is a primary policy purporting to be excess to any "other insurance" in limited circumstances. Thus, TIG's coverage is excess to Monroe's coverage, regardless of the Monroe policy's "other insurance" clause. The Indiana Owner's Statute was clearly intended to resolve coverage disputes caused by competing primary insurers' "other insurance"

clauses and is inapplicable to this case. The trial court correctly entered summary judgment against Monroe on this issue.

### Conclusion

Monroe failed to raise a genuine issue of material fact to support its claim that mutual mistake on the part of it and IU warrants retroactive reformation of the Monroe policy so as to exclude Langreck's accident while driving an IU-owned vehicle from coverage under the "non-owned" and "hired" automobile endorsement. With respect to coverage priority between Monroe and TIG, a pure question of law, Monroe's overall primary policy remains primary and TIG's true excess or umbrella policy is secondary, in accordance with black-letter law adopted in numerous jurisdictions and notwithstanding the Indiana Owner's Statute. We affirm the trial court's entry of summary judgment against Monroe.

Affirmed.

KIRSCH, C.J., and SULLIVAN, J., concur.