

I N T H E

# Indiana Supreme Court

Supreme Court Case No. 24S-CQ-69



FILED

Oct 30 2024, 1:00 pm

C L E R K
Indiana Supreme Court
Court of Appeals
and Tax Court

## William Loomis,
*Plaintiff-Appellant-Cross-Appellee,*

—v—

## ACE American Insurance Company,
*Defendant-Appellee-Cross-Appellant.*

---

Argued: June 19, 2024 | Decided: October 30, 2024

Certified Questions from the
United States Court of Appeals for the Second Circuit
No. 22-863

**Opinion by Justice Massa**
Chief Justice Rush and Justice Goff concur.
Justice Slaughter dissents with separate opinion in which Justice Molter
joins.

**Massa, Justice.**

Under Indiana Rule of Appellate Procedure 64, we accepted two certified questions from the United States Court of Appeals for the Second Circuit: First, is an insurance policy that provides automobile liability insurance in excess of a retained limit, as opposed to in excess of a primary liability insurance policy, a "commercial excess liability policy" within the meaning of Indiana Code section 27-7-5-2(d)? Second, if not, and an insurer issues an automobile liability policy with a $7 million liability limit applicable only after a $3 million retained limit is exhausted, is that insurer's statutory obligation to provide UIM coverage subject to a $3 million retained limit? Answering yes to the first question would dispositively resolve this case without reaching the second one. But based on the ambiguity of two key statutory phrases, which we construe in favor of the insured, Loomis, the answer to both questions is: No.[1]

# Facts and Procedural History

## A. Accident

William Loomis was injured in a two-vehicle accident with a passenger vehicle in New York while driving a truck for his employer, XPO Logistics, Inc., a subsidiary of XPO. The XPO truck was registered in

---

[1] In his opening appellate brief before our Court, Loomis addressed only Question Two. Appellant's State Br. at 9. He made no arguments regarding Question One. *Id.* Instead, Amicus Indiana Trial Lawyers Association ("ITLA") discussed Question One in support of Loomis. ITLA Amicus Br. at 4. Ordinarily, we would find that Loomis waived all arguments pertaining to this question. *See, e.g., Miller v. Patel*, 212 N.E.3d 639, 657 (Ind. 2023) (applying waiver to plaintiff who failed to address an argument about pre-criminal act damages in his opening appellate brief); *Davidson v. State*, 211 N.E.3d 914, 925 (Ind. 2023) (finding waiver for failing to raise argument in opening appellate brief), *reh'g denied*; *Monroe Guar. Ins. v. Magwerks Corp.*, 829 N.E.2d 968, 977 (Ind. 2005) (finding waiver because appellant made claim for the first time in its reply brief). But the cases standing for that general proposition did not involve a certified question or an amicus brief providing cover for an omitted issue in the party's appellate brief. We find these factors crucially distinguishable when applied to this case, but admonish Loomis for sidestepping our March 15, 2024, Order, which accepted both questions and ordered simultaneous briefing on them.

Indiana and garaged in New York. Loomis, in turn, recovered the full amount available from the other vehicle's liability insurer. He then sought recovery from ACE, XPO's insurance company, for his remaining damages. But ACE denied the claim because the policy it issued to XPO ("the Policy") did not contain UIM coverage in Indiana or New York.

## B. Policy

The XPO truck was insured under the Policy. The Policy's "Excess Business Auto Coverage Form" and "Excess Truckers Liability Policy" provide limits of insurance of $7 million, excess of a $3 million "Retained Limit." Joint State App. Vol. II, p. 154–55. It contains three key features.

Feature one: the form states that ACE "will pay the 'insured' for the 'ultimate net loss' in excess of the [$3 million] 'retained limit' because of 'bodily injury' . . . to which this insurance applies, caused by an 'accident' and resulting from the ownership, maintenance or use of a covered 'auto.'" *Id*. at 165. "Ultimate net loss" is defined under the Policy as "the total amount the 'insured' is legally obligated to pay as damages for a covered claim or 'suit'" and "does not include any of the expenses incurred by the 'insured' or [ACE] in connection with defending the claim or 'suit.'" *Id*. at 177. The parties do not contest that XPO is an "insured" under the Policy and that Loomis was also an "insured" at the time of the accident. Joint State App. Vol. III, p. 145.

Feature two: the form also excludes coverage for bodily injury and property damage caused by an accident with an uninsured or underinsured automobile.

Feature three: the form contains a "Limits of Insurance" provision with this statement: "You agree to assume the payment of the 'retained limit' before the Limits of Insurance become applicable." App. Vol. II, p. 170. "Retained limit" is defined under the Policy as "the amount [the insured] must pay before the Limits of Insurances become applicable. . . ." *Id*. at 199. The Policy "does not apply to defense, investigation, settlement or legal expenses, other than 'loss adjustment expenses', or prejudgment interest arising out of any 'accident,' but [ACE] shall have the right and opportunity to assume from the insured the defense and control of any

claim or 'suit,' including any appeal from a judgment, seeking payment of damages covered under this policy arising out of such 'accident' that [ACE] believe[s is] likely to exceed the 'retained limit.'" *Id.*

Together, these features reflect $7 million in liability coverage for any single accident or loss and a $3 million retained limit for any single accident or loss. Put another way, in the event of an accident in which an XPO driver is at fault, the insured—XPO—must pay the injured party $3 million before ACE's $7 million liability coverage is activated.

Accompanying the Policy is a UM/UIM coverage summary form, which states that "[n]o Coverage is offered or provided for vehicles principally garaged or registered in" all states except Alaska, Florida, Louisiana, New Hampshire, Vermont, and West Virginia. *Id.* at 151. Relevant here, it states that XPO has "rejected coverage" in several states. ACE, to be sure, submitted evidence that XPO expressly declined excess uninsured and underinsured motorist coverage, both generally and for specific states. But relevant here, XPO did **not** reject UIM coverage for Indiana or New York, even though none of the forms presented to XPO were Indiana—or New York—specific.

## C. Federal Court Proceedings

After ACE declined to pay Loomis UIM benefits, Loomis sued ACE in New York state court, alleging that ACE had breached the insurance agreement by failing to pay Loomis's claim for underinsured motorist coverage under Indiana and New York state law. ACE then removed the case to the United States District Court for the Northern District of New York based on diversity jurisdiction. Shortly after discovery, the parties cross-moved for summary judgment.

Applying Indiana law, the district court granted Loomis's motion as to the application of our uninsured/underinsured motorist statute ("UM/UIM Statute") to the Policy. *Loomis v. ACE Am. Ins.*, 517 F. Supp. 3d 95 (N.D.N.Y. 2021) ("*Loomis I*"). In reviewing the applicable law, the district court concluded Section 27-7-5-2(d)'s "commercial umbrella or excess liability policy" was ambiguous, and it could be resolved by "liberally" construing the statute in favor of Loomis. *Id.* at 113. As such,

ACE was not exempt from making UIM coverage available because the Policy was not in "excess" over underlying insurance, and so the court read Indiana's requirement of UM/UIM coverage into the Policy. *Id.* at 105–14.

After the district court's order, ACE filed what was construed as a supplemental motion for summary judgment on another issue: whether, after reading Indiana's UM/UIM mandatory coverage provisions into the Policy, ACE has any statutory obligation to pay Loomis for his ultimate net loss within the Policy's $3 million retained limit. *See Loomis v. ACE Am. Ins.*, 593 F. Supp. 3d 34 (N.D.N.Y. 2022) ("*Loomis II*"). The court granted the motion, determining that, even reading the UM/UIM Statute into the Policy, XPO's exhaustion of the retained limit was a valid condition precedent to ACE's obligation to provide UIM coverage. *Id.* at 44–46. Thus, because the retained limit did not violate the UM/UIM Statute, and had not been satisfied, the court granted summary judgment for ACE. *Id.* at 48. The two orders reached two holdings relevant today: First, the Policy is not exempt from the UM/UIM Statute. Second, even though the mandatory UM/UIM provisions were read into the Policy, ACE is not obligated to provide Loomis with UM/UIM coverage until the retained limit has been exhausted. The district court entered final judgment for ACE, and both parties timely appealed.

On appeal, the Second Circuit could not reach a conclusion on Indiana law. *Loomis v. ACE Am. Ins.*, 91 F.4th 565 (2d Cir. 2024). The court admitted that both parties had reasonable interpretations on (1) whether the Policy is an "excess liability policy," and (2) whether ACE can impose the retained limit before providing UIM coverage. It thus certified both questions to this Court, which we accepted. Ind. Appellate Rule 64.

## Discussion and Decision

Indiana's UM/UIM Statute provides that automobile liability insurance policies covering motor vehicles registered or principally garaged in Indiana include uninsured or underinsured motorist coverage "in limits at least equal to the limits of liability specified in the bodily injury liability

provisions of an insured's policy," unless the insured has rejected that coverage in writing or one of the enumerated exceptions applies. Ind. Code § 27-7-5-2(a). The fundamental policy objective of the UM/UIM Statute is "to promote the recovery of damages for innocent victims of auto accidents with uninsured or underinsured motorists." *United Nat'l Ins. v. DePrizio*, 705 N.E.2d 455, 459 (Ind. 1999). In alignment with that fundamental purpose, *Justice v. Am. Fam. Mut. Ins.*, 4 N.E.3d 1171, 1178 (Ind. 2014), this law serves as "a mandatory, full-recovery, remedial statute," *Lakes v. Grange Mut. Cas.*, 964 N.E.2d 796, 804 (Ind. 2012) (quoting *DePrizio*, 705 N.E.2d at 460). These remedial public policy goals countenance a liberal construction of the UM/UIM Statute in favor of the insured. *See DePrizio*, 705 N.E.2d at 459–60 (explaining that uninsured/underinsured motorist statutes are "read in a light most favorable to the insured" (citations omitted)). As such, an insurance policy with "less protection" than what is otherwise required under law would crash into public policy, and thus be "of no force and effect," *Napier v. Am. Fam. Mut. Ins., S.I.*, 179 N.E.3d 504, 509 (Ind. Ct. App. 2021).

## I. An insurance policy that provides automobile liability insurance in excess of a retained limit, as opposed to a primary policy, shall be construed in favor of the insured, Loomis, because the phrase, "commercial excess liability policy," under Indiana law is ambiguous.

The first question is whether the Policy is exempt from the UM/UIM coverage requirements, I.C. § 27-7-5-2(a), because it falls under the "commercial excess liability policy" exemption, *id.* § -2(d). Applying our tools of interpretation, we conclude that the term "commercial excess liability policy" is ambiguous, and such ambiguity must be construed in favor of Loomis.

We start with the general rule in Indiana. Motor vehicle liability insurance policies must include UM/UIM coverage. *Id.* § -2(a). But like all good rules, legal and alike, exemptions exist. The exemption of interest today concerns the proper meaning and operation of the commercial

excess liability policy exception. *Id.* § -2(d) (exempting "commercial umbrella or excess liability polic[ies]" from the requirement).

Here, the parties' arguments take shape on two independent but related fronts: statutory language and precedent. ACE argues that the Policy is exempt because it provides $7 million in "excess" liability coverage over the $3 million retained limit. Appellee's Br. at 14. The thrust of its statutory argument is that the UM/UIM Statute exempts "excess" policies because the statute—by its terms—does not distinguish between policies excess to primary insurance and policies excess to retained limits. *Id.* By contrast, Loomis argued before the Second Circuit that an "excess liability policy" must sit over a primary insurance policy. Federal Appellant's Br. at 4. ITLA picks up where Loomis left off, and argues this phrase is ambiguous because it is vulnerable to more than one reasonable interpretation. ITLA Amicus Br. at 9. Because ambiguity "is to be resolved in favor of the insured," *see Lakes*, 964 N.E.2d at 804–05, that would mean coverage should not be excluded under the exemption—full stop.

The parties also collide on the application of Indiana precedent. ACE relies on two cases, *City of Gary v. Allstate Insurance Company*, 612 N.E.2d 115 (Ind. 1993) and *Monroe Guaranty Insurance Company v. Langreck*, 816 N.E.2d 485 (Ind. Ct. App. 2004), to argue this Policy is exempted from coverage given the larger UM/UIM ecosystem. Loomis, in response, points to *DePrizio*, 705 N.E.2d 455, to argue that the legislature intended the exemption to apply only to traditional excess/umbrella policies, not policies with retained limits.

On a broad level, both parties, as the Second Circuit recognized, "score some points." *Loomis*, 91 F.4th at 575. But this issue of first impression is complicated. Because the term "excess liability policy" is undefined by our legislature, we first must resort to our canons of interpretation to give proper effect to its statutory meaning, before we explore Indiana precedent to see if that meaning is confirmed.

## A. Ambiguous Meaning: "Excess Liability Policy"

Before we begin, we must first lay the groundwork for our method of interpretation. It's an uncontroverted premise of the American legal

system that courts determine the meaning of statutes. *See Ind. Alcohol & Tobacco Comm'n v. Spirited Sales, LLC*, 79 N.E.3d 371, 376 (Ind. 2017). Interpreting legal texts is a supreme component of the judicial role. *Walczak v. Labor Works – Fort Wayne LLC*, 983 N.E.2d 1146, 1152 (Ind. 2013) ("statutory construction . . . is a question of law for the courts" (quotations omitted)). Our primary task in reviewing statutes is to identify and give effect to the legislature's intent. *In re Supervised Est. of Kent*, 99 N.E.3d 634, 638 (Ind. 2018).

But how do we faithfully accomplish that task? To start, we look primarily to statutory language. *See Morales v. Rust*, 228 N.E.3d 1025, 1054 (Ind. 2024) (explaining that "statutory language itself is the best indication of legislative intent") (citing *Nicoson v. State*, 938 N.E.2d 660, 663 (Ind. 2010)). When a statutory term has been defined by the General Assembly, "we are bound by its definition." *WTHR-TV v. Hamilton Se. Sch.*, 178 N.E.3d 1187, 1191 (Ind. 2022). Yet when the legislature is silent on the definition, our plain-meaning canon helps us navigate our quest to carry out legislative intent. *Morales*, 228 N.E.3d at 1054. If we abandoned this hallmark interpretive rule, which has been codified by our General Assembly, *see* I.C. § 1-1-4-1(1) (2024) (undefined terms must be given "their plain, or ordinary and usual, sense . . . ."), we would be amending "unambiguous language," thus threatening our "separation-of-powers because it is the legislature that writes and revises statutes while [courts] merely interpret and apply them," *Morales*, 228 N.E.3d at 1054 (quoting *Ind. Right to Life Victory Fund v. Morales*, 217 N.E.3d 517, 524 (Ind. 2023)). The upshot, then, is that courts "cannot add words or restrictions," but must review "what the statute does—and does not—say." *WTHR-TV*, 178 N.E.3d at 1191 (cleaned up). From this modest yet engaged posture of statutory review, we presume the legislature desired for its language to be applied in a rational and logical manner that faithfully reflects the statute's central policy aims and objectives. *Nicoson*, 938 N.E.2d at 663.

In Indiana, a statute is ambiguous where it is susceptible to more than one reasonable interpretation. *Wagner v. Yates*, 912 N.E.2d 805, 810 (Ind. 2009). But different reasonable interpretations do not negate the court's chief role in determining the best reading of a statute. For example, if confronted with an ambiguous word or phrase, we must still deploy our

traditional interpretive tools to determine the proper meaning of an ambiguous statute. In such an event, like the one at hand, we must apply a liberal construction in favor of the insured. *Lakes*, 964 N.E.2d at 804–05 (noting ambiguity "is to be resolved in favor of the insured").

The first question revolves around the proper meaning of "excess." Yet the implication of this inquiry requires answering another question: excess to **what**? The legislature left this statutory phrase undefined and the question unanswered. ACE argues the UM/UIM Statute broadly includes both a commercial liability policy in excess of a primary policy and one in excess of a retained limit. Loomis, by contrast, contends that it must be excess to a primary policy.

When interpreting undefined statutory language, we typically consult general-language dictionaries and thus "avoid legal or other specialized dictionaries." *Rainbow Realty Grp., Inc. v. Carter*, 131 N.E.3d 168, 174 (Ind. 2019). But when the statutory language involves "[t]echnical words and phrases having a peculiar and appropriate meaning in law," they "shall be understood according to their technical import." I.C. § 1-1-4-1(1). In that case, we must consider the particular context in which the language is used.

The Second Circuit began its statutory analysis by consulting two dictionaries to interpret the meaning of "excess insurance." While this phrase does not precisely track the statutory phrase, "excess liability policy," we assume this phrase is a closely related, if not synonymous, common phrase. As such, its plain meaning definition may be probative, but not dispositive, to the statutory meaning at hand. We thus look first to a general-language dictionary, which defines "excess insurance" as "insurance in which the underwriter's liability does not arise until the loss exceeds a **stated amount** and then only on the excess above that amount." *Excess insurance*, Merriam-Webster's Unabridged Dictionary, https://www.merriam-webster.com/dictionary/excess insurance (last visited Oct. 21, 2024) (emphasis added).

Let's take this **plain-meaning** definition at face value; it still does not provide many helpful clues. The definition of "excess insurance" is ultimately silent on what type of "stated amount" the policy must be

excess to: only a primary liability insurance policy? How about exceeding a retained limit as a condition for coverage? Both? At bottom, this general-language definition fails to yield a clear, determinable answer about whether "excess liability policy" presumes the existence of a primary liability policy, rather than a retained limit below which the insured assumes financial responsibility for the loss. In the end, we must speculate about which interpretation best applies to a "stated amount." ACE argues that, by its plain terms, the UM/UIM Statute has no "limiting language" **cabining** the "reach" of the commercial liability policy exemption. Appellee's State Br. at 16. That may be true, but it also does not contain language expressly **recognizing** retained limits within that "explicit" exemption. *DePrizio*, 705 N.E.2d at 464 (explaining that "absent an explicit statutory exemption," every automobile insurance policy issued for a vehicle or principally garaged in Indiana must provide UIM coverage). If retained limits were constituent parts of this supposedly "explicit" exemption, one would surmise the legislature would add "retained limits" to the statute's text. Even so, like its unclear statutory language, the phrase's plain meaning also fails to provide lifeline support. Based on the plain meaning of "excess liability policy" under a general-language dictionary, this phrase is ambiguous, *Wagner*, 912 N.E.2d at 810, suggesting it will have to be construed in favor of Loomis, *see Lakes*, 964 N.E.2d at 804–05.

We also shift gears and assume that "excess liability policy" is a **technical** term that requires looking at specialized dictionaries and industry context to locate its "peculiar and appropriate meaning in law." I.C. § 1-1-4-1(1). Zooming out of the general-language definition of "excess insurance" and comparing it to its technical counterpart might get us closer to a more precise definition.

Unfortunately, this strategy doesn't resolve the ambiguity. For instance, "excess insurance" is defined by the latest edition of *Black's Law Dictionary* in two ways: "[i]nsurance that protects the insured against loss that exceeds the primary insurance limit or layer of insurance" or "[t]he portion of an insured amount beyond what is retained by the insured for its own account." *Excess Insurance*, Black's Law Dictionary (12th ed. 2024). This technical definition recognizes that either primary insurance or a

retained limit may underlie an excess policy, favoring ACE's interpretation that retained limits fall under this exemption. Yet, the 11th edition, from 2019, defines "excess insurance" as an "agreement to indemnify against any loss that exceeds the amount of coverage under another policy." *Excess Insurance*, Black's Law Dictionary (11th ed. 2019). No mention of retained limits there. Comparing these two recent definitions suggests the scope of the term "excess insurance" is changeable and uncertain. It may include retained limits, but this reading isn't necessarily one of long standing.

One gathers a similar impression by consulting treatises. For example, Couch uses the term "excess policy" in the context of both underlying insurance and self-insurance. 7A Couch on Insurance § 103:13 (3d ed. 2024). Yet, Couch also states that "both **true excess** and umbrella policies require the **existence of a primary policy** as a condition of coverage. The purpose of both excess and umbrella coverage is to protect the insured in the event of a catastrophic loss in which liability **exceeds the available primary coverage.** Accordingly, the excess or umbrella coverage kicks in **only after the underlying primary policy** has been exhausted." 15A Couch on Ins. § 220:32 (3d ed. 2024) (emphasis added) (footnotes omitted). Even if this passage is using the phrase "true excess" to distinguish policies written as excess from policies that are merely excess to other insurance policies where they exist, the choice of the word "true" is telling. New Appleman on Insurance contains a similar ambiguity. It states both that an "excess policy provides specific coverage above an underlying limit of primary insurance" and that "the first layer of coverage above SIR is sometimes described as excess insurance." 4 New Appleman on Ins. L. Libr. Edition § 24.02[2](a) (2024).

Other authorities more forthrightly identify "excess" with the existence of underlying insurance. The Indiana Law Encyclopedia states that "a policy with 'primary liability' obligates the company that issued the policy to pay up to the limits of its policy to cover its insured's liability and 'excess' or secondary coverage is coverage whereby, under the terms of the policy, liability attaches only after a predetermined amount of primary coverage has been exhausted." 16 IND. LAW ENCY. INS. § 168 (2024). And the Restatement of Liability on Insurance says that "true excess insurance

policies" are "purchased as part of a **layered insurance program**." Rest. §
39, cmt. (a) (Am. Law Inst. 2019). We are forced to conclude that even if
"excess liability policy" is, in fact, a technical term, authoritative sources
do not unambiguously include within its definition policies sitting over
retained limits.

In the end, when placing the dictionary definitions of "excess
insurance" side by side, we are left with two reasonable interpretations.
ACE may be correct that, while the plain meaning of "excess insurance" is
silent on the type of stated amount that must be exceeded, the phrase
might broadly encompass retained limits; on the other hand, Loomis may
be correct that this phrase narrowly applies to an underlying primary
insurance policy. On balance, we are left to guess about the proper
meaning of "excess liability policy." But we are not left without a tool in
our toolkit to determine the best meaning of that phrase: it is ambiguous,
and such ambiguity must favor Loomis. *See Lakes*, 964 N.E.2d at 804–05.

## B. Precedential Treatment

Indiana precedent around this question only displays, rather than
resolves, this exemption's ambiguity. ACE contends that "excess liability
policy" bears a clear meaning under several Indiana appellate decisions.
We disagree with that characterization; the picture is unclear at best.

The Court of Appeals precedent cited by ACE only showcases this
ambiguity. ACE's primary authority, *Langreck*, 816 N.E.2d 485, at first
seems to support its view. That case involved a member of Indiana
University's Rowing Club who lost control of a University van while
driving on the way to a rowing meet in Wisconsin. *Id.* at 488. The vehicle
flipped, and several teammates suffered severe injuries as a result. *Id.* On
appeal, the issue centered on which of the potentially liable insurers,
Monroe Guaranty or TIG, was **primary** with respect to liability claims
from the accident. At the time of the accident, a Monroe commercial
general liability policy in effect included a "Non-owned and Hired Auto
Liability" endorsement. *Id.* The endorsement also stated "[t]his insurance
is excess over any of the other insurance, whether primary, excess,
contingent or on any other basis, that is covering the auto as an auto

owned." *Id.* (quotations omitted). The TIG policy was also an umbrella policy. *Id.*

After applying the general rule that "a true excess insurance policy is secondary in priority to a primary insurance policy," the court concluded the TIG policy was, in fact, a "true excess" policy. *Id.* at 492–94. The court considered the terms and features of the policy, and cited several reasons the TIG policy was excess: (1) the policy was an umbrella policy to provide catastrophic liability coverage; (2) the policy was described as an "Excess Liability" policy rather than any other policy; (3) the policy applied in excess to a "retained amount," which included an amount retained by the insured or covered by an underlying insurance policy; (4) the policy disclaimed any responsibility to defend or settle claims; and (5) the policy listed the Monroe Guaranty policy in a schedule of underlying insurance. *Id.* at 494–95. *Langreck* explained that, where an insured has a retained limit, "the full limits of a policy including a retained amount are available to the insured once that amount has been satisfied." *Id.* at 495.

At first blush, *Langreck* appears to give ACE the upper hand. For example, similar to the "excess policy" in *Langreck*, the Policy here is labeled as an "Excess Business Auto [and Truckers Liability] Policy." Joint State App. Vol. II, p. 154. The Policy, too, does not apply until the retained limit is exhausted, *id.* at 155, and it gives ACE the right to assume the defense and control of suits with damages that might exceed the retained limit, *id.* at 199. But there are several fine distinctions between *Langreck* and this case.

For starters, *Langreck* did not involve UM/UIM coverage. Thus, it did not interpret the UM/UIM Statute or the "commercial excess liability policy" exemption. Those facts together reduce *Langreck's* weight. And, unlike our case, *Langreck* involved two competing insurers where the central issue hinged on which carrier was primary with respect to liability coverage. *Langreck*, too, addressed the "other insurance" clause and the priority of coverage between insurers, issues which are not present here.

Other cases cited by ACE for the proposition that the term "excess policy" includes a policy sitting over a retained limit offer little to no utility to answering this question. *See, e.g., Cinergy Corp. v. Associated Elec.*

*& Gas Ins. Servs., Ltd.*, 865 N.E.2d 571, 582–83 (Ind. 2007) (determining an excess liability insurer was not required to pay defense costs under a policy's terms because claims against insured power companies under the Clean Air Act did not flow from an "occurrence"); *Allianz Ins. v. Guidant Corp.*, 884 N.E.2d 405, 420 (Ind. Ct. App. 2008) (holding an excess liability insurer's duty to defend in a products liability case was activated only after the self-insured retention was satisfied), *trans. denied*; *Trinity Homes LLC v. Ohio Cas. Ins.*, 2007 WL 1021825, at *15 (S.D. Ind. Mar. 30, 2007) (concluding that a general liability policy covering the insured's losses from its defective construction projects had a $50,000 self-insured retention that converted it "into an excess policy covering only amounts in excess of the self-insured retention") (cleaned up). Simply put, these cases have nothing to do with Indiana's UM/UIM Statute and its "excess commercial liability policy" exemption.

The dissenting opinion disagrees, concluding that when the legislature used the term "excess policies" it adopted the definitions Indiana common law had already given to the term. *Post*, at 2. We have certainly held that, when a statute supersedes the common law and uses "words of a definite signification under the common law," those words "are deemed to be employed in their known and defined common-law meaning." *Mortg. Consultants, Inc. v. Mahaney*, 655 N.E.2d 493, 495 n.1 (Ind. 1995) (quoting *Truelove v. Truelove*, 86 N.E. 1018, 1019 (Ind. 1909)). We are doubtful, however, that the two appellate decisions using the term "excess" that the dissent points to establish the definite meaning of "excess policy." In one footnote, this Court discussed policies providing "excess coverage over . . . self-insured retentions." *Cinergy*, 865 N.E.2d at 573 n.3. And the Court of Appeals' *Langreck* opinion explained that "retained amounts . . . are found in umbrella policies or policies designed to be excess of a self-insured amount." 816 N.E.2d at 495. It also concluded that the policy there was "excess" to self-insurance in part, and "excess" to underlying insurance in part. *Id.* But neither of these passages used the terms "excess policy" or "excess insurance." Moreover, as we have seen, there are authoritative statements of the common law of insurance that say excess policies sit over underlying insurance. *See, e.g.,* Restatement of Liab. Ins. § 39, cmt. (a) (Am. Law Inst. 2019). And, as we gathered from the treatises examined

above, there may be a difference between "true" excess policies and policies that are merely "sometimes described" as excess. *See* 15A Couch, *supra, § 220:32*; 4 New Appleman, *supra*, § 24.02[2](a). For these reasons, we cannot confidently say that the two passages the dissent cites clearly established the definitive meaning of "excess policy."

The parties also dispute the import of two decisions of this Court that didn't interpret the word "excess" in the context of retained limits but nevertheless addressed the UM/UIM statute, namely *City of Gary* and *DePrizio*. We address each case in turn but find neither case determinative because each one requires us to engage in reasoning at a high level of generality. We decline this invitation today out of a risk-averse posture of overextending the core holding of each case to this one.

Starting first with *City of Gary*. In that case, a police officer was injured while driving a police car owned by the city. 612 N.E.2d at 116. Under a previous iteration of Indiana's uninsured motorist statute, it did not require insurers to provide underinsured motorist coverage. *See id.* at 116. But because the at-fault driver's insurance company was insolvent, the police officer argued that the City, as a **self-insurer** of the police car, was primarily liable for uninsured motorist coverage. *Id*. at 116, 117. This Court rejected that argument on arrival, and instead held that a self-insured municipality, like the City of Gary, was not an "insurer," and thus was not required to provide uninsured motorist coverage under the statute.[2] *Id.* at 119. ACE has a point that, on a general level, *City of Gary* supports its view that Indiana's UM/UIM Statute creates a coverage gap that has not been filled by the legislature to require self-insured entities to provide UIM coverage. *Id.* ("Although we recognize the remedial purpose of the uninsured motorist coverage statute . . . it is not our role to sit as a judicial legislator and write such a requirement into the act[,]" but instead "must come from the legislature."). Thus, *City of Gary* could stand for the

---

[2] Self-insurance is defined under Indiana law as the "retention of the risk of loss by the one upon whom it is directly imposed by law or contract," and, thus, "the choice to self-insure does not mean that the party has insurance, but rather that the party has chosen to retain the risk." *Id.* at 118 (cleaned up).

more general proposition that coverage gaps under the UM/UIM Statute must be filled by the legislature, not the "judicial legislator," even if those gaps flout the statute's remedial purpose affording protection for uninsured motorists. *Id.* But we decline to engage with this case at such a high level of generality, and instead resolve the precise legal question before us. *City of Gary*, when applied here, is distinguishable because it hinged on the fact the relevant statute only applied to **insurers**, and not those who retain the risk of loss and thus do not purchase insurance. *Id.* at 118 ("[s]elf-insurance . . . is not insurance at all, but, rather, . . . 'the antithesis of insurance.'" (quoting *Eakin v. Ind. Intergovernmental Risk Mgmt. Auth.*, 557 N.E.2d 1095, 1098 (Ind. 1990))). But unlike the municipality in *City of Gary*, ACE is the "insurer" who delivered an "automobile liability or motor vehicle liability policy of insurance." I.C. § 27-7-5-2(a). Consider the counterfactual: if Loomis sued **XPO** for UIM benefits, *City of Gary* may be more fitting. But because ACE is the insurer, this case fails to effectively answer whether this Policy is exempted.

Turning next to *DePrizio*. In this case, an employee was killed by an underinsured motorist. 705 N.E.2d at 456. The employee's estate sought UIM coverage under the employer's insurance policies, including an umbrella policy that covered "ultimate net loss in excess of the applicable underlying policy limits." *Id*. at 457. On appeal, this Court reviewed whether an umbrella policy is an "automobile liability or a motor vehicle liability policy" requiring UM/UIM insurance. *Id.*[3] In reviewing the "mandatory," "full-recovery" nature of this "remedial statute," *DePrizio* held that our "underinsured motorist statute requires an umbrella policy that covers excess third-party automobile liability claims to also cover excess uninsured motorist claims." *Id.* at 456, 460. The central doctrinal point of *DePrizio* was that "absent an explicit statutory exemption to the

---

[3] While *DePrizio* interpreted an older iteration of the UM/UIM Statute, the version in effect in October 2017, and the version in effect today, had no variation in the requirement that each insurer "make available, in each automobile liability or motor vehicle liability policy of insurance . . . uninsured and underinsured motorist coverages." *See* I.C. § 27-7-5-2(a) (2013); *id*. § 27-7-5-2(a) (2020).

contrary," the statute's UM/UIM coverage applied to the umbrella policy. *Id.* at 464.

Loomis hangs his hat on *DePrizio*, but that decision gives us pause for at least one reason: *DePrizio* was decided ten years **before** the legislature amended UM/UIM Statute to include the exemption at issue. *See* I.C. § 27-7-5-2(d) (2009). True, *DePrizio* could stand for the larger principle that, in the absence of a clear exemption, the UM/UIM Statute should be construed generously under § 27-7-5-2(a) and restrictively under the § 27-7-5-2(d) exemption. In other words, it should be construed to maximize, not minimize, coverage. This argument may have some bite, but it is not dispositive to whether the amended statute includes a clear exemption for a policy in "excess" over a retained limit. So we are reluctant to overextend *DePrizio* here. That said, between *City of Gary* and *DePrizio*, we find *DePrizio* generally more instructive given its command that exemptions under the UM/UIM Statute be "explicit." In other words, *DePrizio*, though distinguishable, still offers a useful rule for us to analyze the degree to which an exemption—regardless of when it was passed—is explicit, thus allowing us to carry out the remedial purpose of the UM/UIM Statute in promoting recovery for innocent victims of automobile accidents. 705 N.E.2d at 459. Applied here, the commercial excess liability exemption fails to **explicitly** include retained limits. As a result, it suffers from ambiguity. This exemption is anything but clear.

Given the ambiguity in the UM/UIM Statute's definition of "commercial excess liability policy," and the lack of precedent from Indiana courts precisely addressing the narrow question before us, we abide by our longstanding rule to construe this statute "liberally," read in the "light most favorable to the insured." *Id*. at 459–60. We thus read this statutory ambiguity in favor of Loomis, the insured. *See Lakes*, 964 N.E.2d at 804–05. Thus, the answer to our first question is, no.

## II.  An insurer has a statutory obligation to provide UIM coverage—regardless of an imposition of a retained limit as a condition precedent—because the operative phrase, "limits of liability," under

# Indiana law is ambiguous and thus must be construed in favor of the insured.

Because we answered the first question in the negative, we must now address the second question: if an insurer issues an automobile liability policy with a $7 million liability limit applicable only after a $3 million retained limit is exhausted, is that insurer's statutory obligation to provide UIM coverage subject to a $3 million retained limit? Because "limits of liability" is also ambiguous in this case, this answer, too, is no.

The central disagreement between the parties is whether the UM/UIM Statute allows ACE to impose the retained limit as a condition precedent to its statutory obligation to provide UIM coverage. The statute requires that insurers who provide automobile liability coverage also provide UM/UIM coverage "in limits at least equal to the limits of liability specified in the bodily injury liability provisions of an insured's policy," **unless** the insured rejects such coverage in **writing**. I.C. § 27-7-5-2(a). The key language, "limits of liability," draws the battle lines today. Both parties agree that, under the Policy, the retained limit serves as a condition precedent to insurance coverage. The contest, then, is whether Indiana law permits that policy language to begin with. *See Justice*, 4 N.E.3d at 1177 ("So long as the policy language comports with our state statutes, it will control, but if it is inconsistent with those statutes, it is unenforceable." (citations omitted)). Loomis argues that limits of liability is akin to a "numerical limit," and thus, because UIM coverage was not offered and no written waiver was obtained, ACE must provide UIM benefits up to the maximum policy limit of $7 million. Appellant's State Br. at 9. He also argues that a retained limit as a condition of coverage is the "antithesis of insurance." *Id.* at 13 (quoting *Eakin*, 557 N.E.2d at 1098). ACE seems to concede that point, but insists the Policy requires XPO to exhaust the retained limit before ACE will provide coverage. Appellee's State Br. at 25. In reviewing both arguments, which land some punches, we find this phrase, while referring to numerical limits, ultimately ambiguous when dealing with retained limits.

## A. Ambiguous Meaning: "Limits of Liability"

First, we begin with the text. The phrase "limits of liability" is statutorily undefined, so we must look to its plain meaning to locate the legislature's intent, *see Morales*, 228 N.E.3d at 1054; I.C. § 1-1-4-1(1), using a general-language dictionary, *see Rainbow Realty Grp.*, 131 N.E.3d at 174. According to a general-language dictionary, "limit of liability" is defined as "the **maximum amount** for which an insurance company may be held liable under a given policy." *Limit of liability*, Merriam-Webster's Unabridged Dictionary, [https://www.merriam-webster.com/dictionary/limit%20of%20liability](https://www.merriam-webster.com/dictionary/limit%20of%20liability) (last visited Oct. 21, 2024) (emphasis added). Based on its plain terms, "maximum amount" suggests a numerical limit of insurance coverage. This view tracks Loomis's interpretation, which relies on *Black's Law Dictionary* for support.[4] And, our plain-language reading is buttressed by other sections of Indiana's UIM coverage statutes. *See, e.g.*, I.C. § 9-25-4-5 (mandatory minimum liability "limits" referred to were explained in terms of $25,000 and $50,000). In short, the plain meaning of this phrase refers to a numerical limit of some type.

But the phrase does not answer whether the limits of liability—$7 million—is subject to a $3 million retained limit. By its terms, our dictionary definition is silent on whether this phrase allows a condition of coverage. As always, we are mindful of what the text says and does not say. *WTHR-TV*, 178 N.E.3d at 1191 (reiterating the rule that this Court "cannot add words or restrictions" (quotations omitted)). On review, Loomis may be correct that the limits of liability require ACE to provide the $7 million maximum limit of liability. Simply put, nothing in the definition **authorizes** the use of retained limits as a condition precedent.

---

[4] It defines "liability limit" as "[t]he maximum amount of coverage that an insurance company will provide on a single claim under an insurance policy." *Liability Limit*, *Black's Law Dictionary* (11th ed. 2019). While both definitions capture the same point about numerical limits, we proceed under the view that "limit of liability" is a common term subject to a plain meaning analysis using a general-language dictionary. Even if the term is technical and not a common one, its meaning is nonetheless the same and would therefore not affect our analysis. We thus avoid relying on "legal or other specialized dictionaries" to reach our conclusion today. *Rainbow Realty Grp.*, 131 N.E.3d 174.

That said, ACE's view could also carry the day because nothing in the definition **prohibits** the use of retained limits either. Both views are reasonable, so we must speculate about which interpretation should prevail. But because this general-language definition fails to point us to a clear, determinable answer, and because both parties put forth reasonable competing interpretations, we find this term ambiguous. *See Wagner*, 912 N.E.2d at 810. As such, we must construe such ambiguity in favor of Loomis. *See Lakes*, 964 N.E.2d at 804–05.

## B. Precedential Treatment

Next, we look to precedent to check our work. In short, the precedent around this novel question does not provide us with much guidance today.

Let's start first with the cases cited by ACE. It argues "the uncontroverted Indiana appellate case law" recognizes an insurer's **coverage** obligations containing a retained limit are activated only "[a]fter the self-insured retention amounts specified in the policies are satisfied." Appellee's Br. at 24 (quoting *Cinergy Corp.*, 865 N.E.2d at 576–77). At base, though, these cases involve instances where our courts concluded "retained limits in liability insurance policies are valid condition precedents such that the insurer's **liability** coverage" only comes into play when the retained limit is satisfied. *Loomis*, 91 F.4th at 580 (emphasis in original). No party disputes the "enforceability" of a retained limit concerning a liability insurance claim. *Id.* The cases cited by ACE, then, are inapt because they do not concern **UIM coverage**. *See, e.g.*, *Langreck*, 816 N.E.2d at 495–96 (excess umbrella liability coverage over primary motor vehicle insurance and retained limits); *Allianz*, 884 N.E.2d at 410 (excess products liability above self-insured retention). Alas, they do not answer whether, because this Policy has a $3 million retained limit for liability coverage, ACE's obligation to provide UIM coverage applies only when the $3 million retained limit has been met. These cases offer minimal value to us.

At the urging of both parties, we take a step back and once again examine our own precedent in *City of Gary* and *DePrizio*. Like before, both cases provide illustrative general principles, but neither case conclusively

answers this question. While *City of Gary* allowed for the existence of a coverage gap with self-insured employers without UM/UIM coverage—thus running afoul the remedial purpose of the UM/UIM Statute—its central holding, as explained earlier, was that the UM/UIM Statute applies only to **insurers** to provide UM/UIM coverage with their liability policies. 612 N.E.2d at 119. But ACE, unlike the *City of Gary*, is the insurer. *See id.* *DePrizio* may seem more helpful, as it expressly counsels against limiting mandatory coverage absent an "explicit statutory exemption," 705 N.E.2d at 464, given the backdrop and remedial purpose of the UM/UIM Statute, *id.* at 461 (explaining the "history of expanding the availability of uninsured and underinsured motorist coverage" designed to afford "insureds the opportunity for full compensation for injuries inflicted by financially irresponsible motorists"). Yet *DePrizio* does not address whether an insurer's statutory UM/UIM obligation is subject to a retained limit as a condition precedent. Simply put, these cases fail to establish a solid footing for our resolution. At best, the answer is still ambiguous.

We resolve the ambiguity in Loomis's favor and thus conclude that the term "limits of liability," within which ACE was statutorily obligated to provide UIM coverage, does not contemplate a retained limit as a condition of coverage. Yet ACE failed to obtain a written rejection from XPO for vehicles registered in Indiana covered under its Policy as required under Indiana Code Section 27-7-5-2(b). As such, it could not escape UIM coverage from being read into its Policy. Joint State App. Vol. II, pp. 121–24. Simply put, if ACE had obtained a written rejection of UIM coverage from XPO for vehicles registered in Indiana, it would have escaped liability. Yet we are here today tasked with answering two certified questions about the meaning of Indiana law. And like our answer to the first question, we find the ambiguous meaning of "limits of liability" to favor coverage. *See Lakes*, 964 N.E.2d at 804–05.

## Conclusion

For these reasons, we reach two holdings today: first, an insurance policy that provides automobile liability insurance in excess of a retained limit, as opposed to a primary policy, shall be construed in favor of the

insured because the phrase, "commercial excess liability policy," under Indiana law is ambiguous. Second, an insurer has a statutory obligation to provide UIM coverage—regardless of an imposition of a retained limit as a condition precedent—because the operative phrase, "limits of liability," under Indiana law is ambiguous and thus must be construed in favor of the insured. Accordingly, the answer to both questions, then, is no.

Rush C.J. and Goff, J. concur.
Slaughter, J., dissents with separate opinion in which Molter, J., joins.

ATTORNEYS FOR APPELLANT, WILLIAM LOOMIS

Michael J. Longstreet

Longstreet & Berry, LLP

Fayetteville, New York

Daniel Pfeifer
Pfeifer, Morgan & Stesiak
South Bend, Indiana

ATTORNEYS FOR APPELLEE, ACE AMERICAN INSURANCE COMPANY

Matthew R. Gutwein

Alexander J. Pantos

Delaney & Delaney LLC

Indianapolis, Indiana

Kurt M. Mullen

Pierson Ferdinand LLP

Boston, Massachusetts

Michael B. de Leeuw

Cozen O'Connor

New York, New York

ATTORNEY FOR AMICUS CURIAE, INDIANA TRIAL LAWYERS
ASSOCIATION

Scott A. Faultless

Craig Kelley & Faultless LLC

Indianapolis, Indiana

**Slaughter, J., dissenting.**

Unlike the Court, I would answer the first certified question in the affirmative, obviating the need to answer the second question. We should hold that the disputed insurance policy, which provides automobile liability insurance in excess of a retained limit, is a "commercial umbrella or excess liability policy" under Indiana Code section 27-7-5-2(d). While Indiana's insurance code generally requires a motor vehicle liability insurance policy to include coverage for uninsured and underinsured (UM/UIM) motorists, Ind. Code § 27-7-5-2(a), this requirement does not apply to a commercial excess liability policy, *id.* § 27-7-5-2(d). The parties disagree whether the disputed Ace policy is a commercial "excess" liability policy. I would hold that the policy, with its retained limit, is such a policy because its terms are quintessentially those of an excess (not a primary) policy. The insurance code's silence on the meaning of "excess" policy does not authorize the Court to rewrite law by construing the code liberally in favor of the insured. Thus, Ace had no obligation to include UM/UIM insurance in the policy or obtain a written rejection of coverage.

A

The UM/UIM statute does not answer the question before us. But our appellate precedent, properly understood, guides our inquiry. That precedent suggests that an excess policy has either a retained limit or an underlying primary policy and no duty to defend. Secondary sources discussing excess liability insurance policies buttress that conclusion. Since the Ace policy includes terms characteristic of excess policies, and omits terms found in primary policies, I would hold the policy is an excess policy under section 2(d).

1

Our insurance code does not define an "excess" policy and does not expressly address whether an "excess" policy must have an underlying primary policy, or whether an underlying self-insured retained limit will do. Though this is an issue of first impression under our UM/UIM statute, analogous Indiana precedent defining "excess" policies in related contexts should govern our analysis here. Both our Court and the court of appeals

have defined excess policy in similar contexts based on a policy's function or terms. *Ante*, at 12–18 (discussing and citing cases).

According to our caselaw, one common element found in excess policies is a retained limit. For example, in *Cinergy Corporation v. Associated Electricity & Gas Insurance Services,* we described a self-insured retention limit as "excess coverage", though it was not excess of a primary policy. 865 N.E.2d 571, 573 n.3 (Ind. 2007); see also *Trinity Homes LLC v. Ohio Cas. Ins. Co.*, 2007 WL 1021825, at *15 (S.D. Ind. Mar. 30, 2007) ("A self-insured retention endorsement effectively transforms the policy from a primary policy into an excess policy covering only amounts in excess of the self-insured retention." (internal quotation omitted)). And our court of appeals has recognized that while a primary policy has a deductible, an excess policy can include either a retained limit or an underlying primary policy. *Monroe Guar. Ins. v. Langreck*, 816 N.E.2d 485, 495 (Ind. Ct. App. 2004). A deductible is subtracted—deducted—from the policy's liability limits, thus reducing the insurer's total obligation to the insured. *Ibid*. But a retained limit has no effect on the limit of the insurer's liability. *Ibid.*

Another common element of an excess policy is no duty to defend. As *Langreck* observed, in a primary policy, the "default rule" is that the insurer will defend against any suit for damages covered by the policy. *Id*. at 494–96. Excess policies, in contrast, either omit such duties, *ibid.* (noting the excess policy expressly disclaimed a duty to defend), or have a duty to defend only when the self-insured retention is exhausted, *Allianz Ins. v. Guidant Corp.*, 884 N.E.2d 405, 420 (Ind. Ct. App. 2008) (noting excess policy's duty to defend arose only after retained limit was exhausted).

The Court today rejects this precedent for two reasons. First, the Court dismisses these cases because they do not interpret section 27-7-5-2(d) specifically. *Ante*, at 17–18. True enough, but this precedent is our best evidence of what the legislature had in mind when it enacted section 2(d). We presume the legislature "intends to incorporate the well-settled meaning of the common-law terms it uses". *Jam v. Int'l Fin. Corp.*, 139 S. Ct. 759, 770 (2019) (internal quotation omitted); cf. *Henderson v. New Wineskin Ministries Corp.*, 160 N.E.3d 582, 586 (Ind. Ct. App. 2020) (interpreting "premises" based on both "premises-liability jurisprudence" and Black's Law Dictionary). Our appellate courts defined excess policies before the legislature excepted commercial excess liability policies in the UM/UIM statute.

See I.C. § 27-7-5-1.5(b) (2005); *Langreck*, 816 N.E.2d at 493–95 (decided in 2004). Thus, we can presume the legislature understood how Indiana caselaw defined excess policies when it added "commercial umbrella or excess liability policy" to the UM/UIM statute. Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 320–21 (2012) (discussing canon of imputed common-law meaning). Had the legislature wanted to cabin the meaning of this statutory term, it could have defined the term narrowly as excess to a primary policy.

Second, the Court claims these cases define the word "excess", not "excess policy". *Ante*, at 14–15. This purported distinction slices the bologna too thinly. *Cinergy*, *Allianz*, and *Trinity* all discuss "excess" in the context of insurance policies. *Cinergy*, 865 N.E.2d at 573 n.3 ("The policies provide excess coverage over the self-insured retentions of $500,000 for two of the policies and $1,000,000 for one of the policies."); *Allianz*, 884 N.E.2d at 409–10 (noting excess coverage under the "commercial umbrella liability insurance policy . . . is subject to a self-insured retention"); *Trinity Homes*, 2007 WL 1021825, at *15 (recognizing a self-insured retention effectively transforms a primary policy into an excess policy).

The Court's secondary sources do not undermine but reinforce this precedent defining excess policy broadly to include self-insurance. The two insurance treatises the Court relies on—Couch on Insurance and New Appleman on Insurance—both acknowledge that an "excess" policy can include a self-insured retention. *Ante*, at 11. Couch explains that excess-liability policies "explicitly contemplate that the insured will carry primary insurance coverage (or **self-insure**) for amounts below the excess policy's floor". 7A Couch on Ins. § 103:13 (3d ed. 2024) (emphasis added). And Appleman instructs that "the first layer of insurance coverage **above SIR** [self-insured retention] is sometimes described as 'excess insurance.'" 4 New Appleman on Ins. Law Libr. Ed. § 24.02[2][a] (2022) (emphasis added). Another provision from Appleman, which the Court overlooks, also defines excess insurance to include a self-insured retention: "Similarly an excess insurance policyholder that self-insures instead of purchasing a primary policy must exhaust its SIR before the excess insurer is required to respond to a loss." *Id.* § 24.06[1] (2023).

Likewise, the Court's attempted distinction between so-called "true" excess policies and policies "'sometimes described' as excess" misses the

mark. *Ante,* at 15 (quoting 15A Couch, *supra* at 3, § 220:32; 4 New Appleman, *supra* at 3, § 24.02[2](a)). Whether an excess policy is "true" or "not true" has nothing to do with whether an excess policy must sit atop a primary policy. According to both Appleman and Couch, a "true" excess policy is simply an excess policy that does not "broaden" the insured's "underlying coverage". 4 New Appleman, *supra* at 3, § 24.02[2][a]; 15A Couch, *supra* at 3, § 220:32. Besides these two treatises, another persuasive secondary source distinguishes "true" excess policies from "policies that are considered to be excess by virtue of the operation of 'other insurance' clauses." Restatement of Liab. Ins. § 39, cmt. (a) (Am. L. Inst. 2019). But none of these distinctions is at issue here. And nothing in these secondary sources defines excess insurance as **excluding** an excess policy with a self-insured retained limit or **excluding** any other feature of an excess policy described in our precedent. Thus, despite the Court's strained reading, none of these authorities precludes us from treating the Ace policy as an excess liability policy.

2

Given the statutory silence, our case law, and these secondary sources, we should treat the Ace policy as an excess liability policy. On its face, the Ace policy is an excess policy with a retained limit: specifically, it is an "Excess Business Auto [Truckers] Liability Policy" with a $7 million liability limit, excess of a $3 million retained limit, also called a self-insured retention. The policy says that Ace will pay the "ultimate net loss" in excess of the $3 million retention.

As an insured, XPO is liable for claims below this retention threshold, given its agreement to "assume payment of the 'retained limit' before the Limits of Insurance become applicable." In other words, Ace's liability is triggered once XPO has exhausted its $3 million retention, but not until: "In no case will [Ace] be required to pay the 'retained limit' or any portion thereof". Once the $3 million is exhausted and Ace's liability is triggered, the full coverage limit of $7 million is available. *Id.* at 170. If the Ace policy's $3 million retained limit were a deductible, Ace would be liable for only $4 million of the policy's $7 million coverage limit.

The Ace policy also has no duty to defend. Ace's duty to pay the "ultimate net loss" in excess of the retained limit does not include "any of the expenses incurred by the 'insured' or [Ace] in connection with defending

the claim or 'suit'". Indeed, the Ace policy specifically "does not apply to defense, investigation, settlement, or legal expenses, other than 'loss adjudgment expense', or prejudgment interest arising out of any 'accident'". The policy's main coverage form specifically excludes coverage for bodily injury caused by an accident with an uninsured or underinsured vehicle.

To effectuate the statute's text and our appellate precedent, we should hold the policy is a commercial excess liability policy under section 27-7-5-2(d) and decline to impose UM/UIM coverage.

### B

The Court holds otherwise by finding the statutory exemption provision ambiguous and construing it liberally for the insured. In doing so, the Court substitutes its own judgment for that of the legislature, flouts our strong preference for enforcing party agreements, yet never analyzes the disputed Ace policy.

The Court acknowledges that the insurance code neither defines an "excess" policy nor specifies whether an excess policy must have an underlying primary policy. *Ante*, at 9. The legislature could have defined an "excess liability" policy under the UM/UIM statute. But it did not. Likewise, it could have said that an "excess" policy must be in excess of a primary policy. But, again, it did not.

Faced with the legislature's silence, the Court relies on the UM/UIM statute's remedial nature, which the Court treats as license to construe the statute "liberally" and in the "light most favorable to the insured." *Id.* at 17–18 (quoting *United Nat'l Ins. v. DePrizio*, 705 N.E.2d 455, 459 (Ind. 1999)). The Court's approach to statutory interpretation empowers courts first to discern a statute's purpose and then to interpret all issues arising under the statute in light of that purpose. This approach often amounts to "an open invitation to engage in 'purposive' rather than textual interpretation, and generally to engage in judicial improvisation." Scalia & Garner, *supra* at 3, at 365–66.

The other problem with the Court's approach is that it favors one public policy (extending UI/UIM coverage to insureds) above another (permitting freedom of contract). In relying solely on the public policy favoring coverage, the Court rejects the compelling—and countervailing—public

policy of enforcing "contracts that represent the freely bargained agreement of the parties." *WellPoint, Inc. v. Nat'l Union Fire Ins.*, 29 N.E.3d 716, 724 (Ind.), modified on reh'g, 38 N.E.3d 981 (Ind. 2015); cf. *Perdue Farms, Inc. v. L&B Transport, LLC*, 239 N.E.3d 842, 847–48 (Ind. 2024) (enforcing commercial parties' forum-selection clause and rejecting public-policy objection to litigating related claims in multiple venues).

By ignoring the parties' freedom of contract, the Court voids terms negotiated between two commercial parties that best suited their circumstances. The disputed policy terms are clear: Ace and XPO intended to establish an excess liability policy. Of course, it would be another matter if the policy itself were unclear and the parties were arguing over how to interpret an ambiguous term. Then our common-law rule of *contra proferentem* ("against the offeror") would counsel interpreting the agreement against its draftsman. But that is not this case.

The Court's failure to analyze the Ace policy is troubling because we should not answer certified questions in the abstract. See *Pence v. State*, 652 N.E.2d 486, 488 (Ind. 1995) (holding the Indiana Constitution's separation-of-powers clause limits the judicial power to deciding actual disputes between litigants). Here, that means we should decide the legal fate of this policy and not simply answer federal-court-posed questions devoid of the factual context in which the case arises. To do otherwise risks exceeding our limited role and provides little guidance to litigants in future cases.

In lieu of the Court's approach, the better approach would be to recognize that (1) our insurance code does not answer this question; (2) our appellate precedent suggests an answer; (3) the Ace policy has all the earmarks of an excess policy as defined in our appellate case law; (4) this result is consistent with the statutory exemption; and (5) the result supports the parties' freedom of contract.

\* \* \*

For these reasons, I respectfully dissent.

Molter, J., joins.